2003 DSD 5

**UNITED STATES of America**

v.

**Phillip EASTMAN**

**No. 02–CR–30089.**

United States District Court,
D. South Dakota,
Central Division.

Feb. 10, 2003.

Jay P. Miller, Assistant United States Attorney, Pierre, for Plaintiff.

Jana M. Miner, First Assistant Federal Public Defender, Pierre, for Defendant.

## ORDER

ROSENBAUM, Chief Judge.

Defendant objects to the Report and Recommendation issued January 31, 2003, by the Honorable Mark A. Moreno, United States Magistrate Judge. Defendant's ob-

jections to the Report were timely filed, pursuant to Local Rule 72.1(c)(2).

Based upon a *de novo* review of the record herein, the Court adopts the Magistrate's Report and Recommendation. Accordingly, defendant's motion to suppress statements and physical evidence [Docket No. 30] is denied.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION FOR DISPOSITION OF DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND PHYSICAL EVIDENCE

MORENO, United States Magistrate Judge

### I.

[¶ 1] Defendant, Phillip Eastman (Eastman), filed a Motion to Suppress Statements and Physical Evidence and supporting Memorandum on January 3, 2003. A hearing was held ten days later on the Motion at which four witnesses testified and four exhibits were received into evidence. Following the hearing, the record was supplemented with an additional exhibit by consent of the parties. Because Eastman's Motion is a dispositive one, this Court is only authorized to determine the same on a Report and Recommendation basis. Pursuant to 28 U.S.C. § 636(b)(1), the Court does now make and propose the following Report and Recommendation for disposition of the Motion.

### II.

[¶ 2] Eastman, a 20–year–old (dob 10–1–82) Native American, is charged with four counts of sexual abuse of a minor in violation of 18 U.S.C. §§ 1153, 2243(a), 2246(2)(A), (B). The Indictment alleges that Eastman sexually abused T.B., a 13–year–old female child, on or about August 3, 2002, in LaPlante, South Dakota on the Cheyenne River Sioux Tribe (CRST) Res-

ervation. Eastman has pled not guilty to all four counts of the Indictment and is currently being detained pending trial.

[¶ 3] In his Motion, Eastman seeks to suppress any and all statements made and physical evidence obtained by CRST police officers on Fourth, Fifth and Sixth Amendment grounds. Plaintiff, United States of America (Government), asserts that Eastman waived his constitutional rights and agreed to talk to tribal officers. The Government also argues that the buccal swabbings he provided and the photographs taken of him were not the "fruit" of an illegal interview or otherwise suppressible.

[¶ 4] At the conclusion of the January 13, 2003 hearing, the Court took the matter under advisement. After careful study of the facts and circumstances present and relevant precedent, the Court concludes that Eastman's Motion should be denied, as explained in more detail below.

### III.

[¶ 5] On Saturday, August 3, 2002, at 7:24 a.m., tribal officers were dispatched to house number 778 in LaPlante in response to a sexual assault. Upon arriving at the house, officers were told that T.B. had been raped by Eastman and others.

[¶ 6] At 4:16 p.m. that same day, Eastman was located and arrested tribally for sexual contact with a minor and underage consumption. Following his arrest, Eastman was taken to the CRST jail. The next day, a $500 cash bond was set on the tribal charges.

[¶ 7] On Monday, August 5, 2002, CRST police detectives James Norris, Jr. and Larry LeBeau interviewed Eastman. The interview began at approximately 11:30 a.m. and ended about 1:00 p.m. Eastman had not been able to make bail and had remained in jail since his arrest two days later. Before any questioning began, Norris read Eastman his *Miranda* rights out loud from and Advise of Rights form.

Eastman verbally, and with a head nod, indicated that he was willing to talk to detectives. Norris then asked Eastman to read the Waiver of Rights portion of the form and Eastman did so. When he finished, Eastman said, "What about a public defender" to which Norris replied, "Phillip, that's up to you in your entirety to make that decision. But if you do, I'm going to send this file as is to the U.S. Attorney's Office without Phillip Eastman's side of the story." Eastman answered saying, "I know I didn't rape anyone because why would I have these [pointing to hickeys he had on his face and neck area]?" In response, Norris continued, "Phillip, if you want to tell me anything about what you did or didn't do or anything, I need you to sign the form if you want to talk to myself and Larry—Detective LeBeau." Upon hearing this, Eastman declared, "Well, I know I didn't do anything so I'll talk to you guys" and proceeded to sign the Waiver.[1]

[¶ 8] Eastman was thereafter questioned about the rape allegations that resulted in his arrest and made incriminatory statements concerning the same. He signed, in two places, the notes Norris himself penned during the interview. He also provided a buccal swab from his mouth for purposes of DNA testing and allowed photographs to be taken of him and his hickeys.

[¶ 9] At some point following the arrest, tribal police requested that a judicial determination be made as to whether there was probable cause to support the arrest of Eastman for aggravated sexual contact with a child.[2] Ultimately, a tribal judge made a formal finding of probable cause on August 5th at 11:00 p.m.

[¶ 10] Eastman remained in custody until Wednesday, August 7, 2002, when he was released on a personal recognizance bond.[3] Eventually, but not until several weeks later, Eastman was charged in both federal and tribal court with sexual offenses arising out of the incident with T.B.

## IV.

[¶ 11] At the outset, unlike the situation that existed in *United States v. Red Bird*, 287 F.3d 709 (8th Cir.2002) (*Red Bird II*), there is no persuasive evidence that (1) Eastman had been formally charged, by Complaint or otherwise, or had appeared in court prior to his August 5th interview; (2) he was represented by "counsel" at the time of the interview[4],

---

1. The form itself contains the words "Wants Public Defender ..." at the bottom under the signature lines. When asked about this, Norris testified that he wrote these words down when Eastman, after reading the Waiver section of the form aloud, made the comment, "What about a public defender." Eastman's comment and Norris' notation pertaining to it both occurred prior to the time Eastman executed the Waiver.

2. Presumably, this was done in an effort to comply with the dictates of *County of Riverside v. McLaughlin*, 500 U.S. 44, 55–59, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991).

3. Apparently, as a matter of policy on the CRST Reservation, if an arrestee, who has been given a cash bond, is not arraigned in tribal court within three working days of his arrest, the bond is automatically modified to a personal recognizance bond. This is what appears to have occurred in Eastman's case and explains why his $500 cash bond was subsequently changed to a personal recognizance bond.

4. It is not clear whether a person who is admitted to practice law in tribal court, but not elsewhere, is a "lawyer" within the meaning of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Brenda Claymore Dupris, the CRST public defender, is not admitted to practice law in any state or federal courts in South Dakota, nor is anyone on her staff a licensed attorney within the state.

The per se rule in *Miranda* was based on the Supreme Court's belief that lawyers occupy a critical position in the criminal justice

and that Norris and LeBeau knew this; and (3) the detectives were working in tandem with the Federal Bureau of Investigation (FBI) in the investigation and charging of Eastman.[5] *See and compare* 287 F.3d at 711–12, 714–16 & n. 2; *see also United States v. Red Bird,* 146 F.Supp.2d 993, 995–97, 1001–02, 1004–08 (D.S.D.2001) (*Red Bird I* ).

■ [¶ 12] Because no adversary judicial criminal proceedings had been initiated against him in tribal court or elsewhere, Eastman's Sixth Amendment right to counsel, assuming that he had one, never attached and therefore, was not infringed. *Red Bird II,* 287 F.3d at 715–16; *Red Bird I,* 146 F.Supp.2d at 996–1002, 1006–08.

### V.

■ [¶ 13] While a suspect in a criminal investigation has no Sixth Amendment right to the assistance of counsel until criminal proceedings have been initiated, the suspect nonetheless has the right to consult with an attorney, to have counsel present during questioning and to have

police explain this right to him before any interrogation begins. *Miranda,* 384 U.S. at 469–73, 86 S.Ct. 1602. Such a right, established in *Miranda,* was one of a "series of recommended 'procedural safeguards' ... [that] were not themselves rights protected by the Constitution, but were instead measures to insure that the right against compulsory self-incrimination was protected." *Davis v. United States,* 512 U.S. 452, 457, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (quoting *Michigan v. Tucker,* 417 U.S. 433, 443–444, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974)).

■ [¶ 14] The *Miranda* Court deemed the right to counsel important enough to require the special protection of a knowing, voluntary and intelligent waiver standard. *Edwards v. Arizona,* 451 U.S. 477, 482–83, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). If a suspect is given *Miranda* warnings and waives his right to counsel, law enforcement officers are free to question him. *North Carolina v. Butler,* 441 U.S. 369, 372–76, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). But if the suspect

---

system of this country because of their unique ability to protect the Fifth Amendment rights of a client who is being interrogated in a custodial context. Lawyers have specialized training and are in a position to advise their client as to his legal rights. Lawyers are likewise well versed advocates, skilled in representing their client's interests in pre-and post-accusatory matters involving both the police and the court system. In addition, lawyers have the power to act on behalf of their client and their communication with him is protected by the attorney/client privilege. Lawyers also have an ethical obligation to their client. *Fare v. Michael C.,* 442 U.S. 707, 719–20, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979).

It would appear that the public defender for CRST is in a position to provide the type of legal assistance necessary to protect the Fifth Amendment rights of an accused undergoing custodial interrogation that a lawyer can offer. The Court, however, need not decide this

thorny issue here because even assuming that the tribal public defender referred to in Eastman's statement was a "lawyer" for purposes of *Miranda,* the statement was not an actual request for counsel, but rather, nothing more than an indication that he *might* want a lawyer. *See post* at 8 and n. 6.

5. Eastman testified that on August 5th, just hours before his interview with Norris and LeBeau, he appeared in court and was represented by the Tribal Public Defender's Office on the aggravated sexual contact with a minor charge and a separate elder abuse charge. The Court, however, did not find Eastman's testimony on this point, or in general, to be credible. For one thing, his contention that he had been to court and was being represented by a tribal public defender at the time of the interview, is belied by the CRST records and is not corroborated in any manner. Even more telling is the fact that Eastman, before testifying, obtained and read a copy of the *Red Bird* decision.

requests counsel after being Mirandized, he may not be questioned until a lawyer has been made available to him or he initiates conversations with officers. *Edwards,* 451 U.S. at 484–85, 101 S.Ct. 1880. This "second layer of prophylaxis for the *Miranda* right to counsel," *McNeil v. Wisconsin,* 501 U.S. 171, 176, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights," *Michigan v. Harvey,* 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990). Thus, a suspect who has invoked his right to counsel cannot be questioned regarding any offense unless an attorney is present. *Minnick v. Mississippi,* 498 U.S. 146, 153, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990); *Arizona v. Roberson,* 486 U.S. 675, 682, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). The prohibition against further questioning, like other aspects of *Miranda,* is not itself mandated by the Fifth Amendment, but is instead justified by its "prophylactic purpose." *Connecticut v. Barrett,* 479 U.S. 523, 528, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987).

■ [¶ 15] The applicability of the *Edwards* rule requires courts to "determine whether the suspect actually invoked his right to counsel." *Smith v. Illinois,* 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984); *see also Fare,* 442 U.S. at 719, 99 S.Ct. 2560. Such an inquiry is an objective one. *Davis,* 512 U.S. at 459, 114 S.Ct. 2350; *Barrett,* 479 U.S. at 529, 107 S.Ct. 828. "Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis,* 512 U.S. at 459, 114 S.Ct. 2350 (quoting *McNeil,* 501 U.S. at 178, 111 S.Ct. 2204). If a suspect's reference to an attorney "is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel

. . . the cessation of questioning [is not required]." *Id.* "Rather, the suspect must unambiguously request counsel." *Davis,* 512 U.S. at 459, 114 S.Ct. 2350. Although the suspect need not speak with linguistic perfection, "he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* If a suspect's statement is not objectively clear, *Edwards* does not require that the officer stop questioning the suspect. 512 U.S. at 459, 114 S.Ct. 2350.

[¶ 16] "Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." *Id.* at 461, 114 S.Ct. 2350. Clarifying questions help protect the suspect's rights by helping to insure that he gets an attorney when he wants one and minimize subsequent judicial second guessing as to whether the suspect is actually invoking his right to counsel. *Id.* The Supreme Court, however, has declined to adopt a rule requiring that police officers ask clarifying questions, believing instead that such a practice should be permissive and left to the discretion of officers based on the circumstances present. *Id.* at 461–62, 114 S.Ct. 2350.

■ [¶ 17] In this case, Eastman's cryptic statement, "What about a public defender", when compared to the defendant's comment in *Davis* that, "Maybe I should talk to a lawyer" did not constitute an unambiguous request for counsel. Norris attempted to clarify Eastman's statement, even though he was not required to do so, by telling Eastman that it was his decision. Eastman, apparently believing that the incident with T.B. was consensual and that he did not do anything wrong, agreed to talk to Norris and LeBeau with-

out counsel or a public defender present. Eastman had been advised of his *Miranda* rights and interviewed on at least one prior occasion in state court. Significantly, he admitted he knew and understood that he could get a lawyer before saying anything, but did not know why he talked to detectives without one. Based on the evidence and the credibility of the witnesses who testified,[6] the Court is unable to conclude that Eastman's statement—"What about a public defender"—was an unambiguous invocation of his *Miranda* right to counsel.

## VI.

### A.

[¶ 18] After agreeing to talk to Norris and LeBeau, Eastman signed the written Waiver and provided detectives with a detailed rendition of what he said and did on the day of the alleged rape. But did he really waive his *Miranda* rights before he made his incriminatory statements to detectives?

[¶ 19] Preliminarily, the waiver of *Miranda* rights and the post-waiver invocation of these rights are separate and distinct questions. *Smith*, 469 U.S. at 98, 105 S.Ct. 490; *see also State v. Tuttle*, 2002 SD 94, ¶ 14, 650 N.W.2d 20, 28. In the context of an initial waiver, the Government has a "heavy burden", *Miranda*, 384 U.S. at 475, 86 S.Ct. 1602, to demonstrate that a suspect knowingly and intelligently waived his *Miranda* rights, *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *Edwards*, 451

U.S. at 482–83, 101 S.Ct. 1880. Once, however, the suspect has waived his rights, *Davis* requires that a post-waiver invocation of them be made with clarity. 512 U.S. at 459, 114 S.Ct. 2350. Eastman's supposed invocation of his right to counsel was made *before* he executed the waiver and as such, the Government bears the burden of proving that he did in fact waive his rights and agree to talk to detectives without the assistance of counsel.

[¶ 20] The inquiry into whether a waiver is valid or has been forced has "two distinct dimensions." *Moran*, 475 U.S. at 421, 106 S.Ct. 1135. First, it must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* Second, it must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.; see also United States v. Syslo*, 303 F.3d 860, 865 (8th Cir.2002); *Tuttle*, 2002 SD 94 at ¶ 9, 650 N.W.2d at 26.

### B.

[¶ 21] When reviewing the voluntariness of the waiver, a court looks at the totality of the circumstances and must determine whether the individual's will was overborne. *Syslo*, 303 F.3d at 866; *see also United States v. Holloway*, 128 F.3d 1254, 1256 (8th Cir.1997). Two factors must be considered in the voluntariness inquiry: the conduct of the law enforcement officers and the capacity of the individual to resist pressure to confess. *Mincey v. Arizona*, 437 U.S. 385, 399–401, 98

**6.** Eastman insisted that (1) he "asked for a lawyer and was told no";(2) he was never informed of his rights or read the Waiver portion of the Advise of Rights form; (3) Norris put words into his mouth; and (4) he did not say all of the things that were contained in the report and handwritten notes Norris prepared of the August 5th interview.

Even if the Court found Eastman's testimony to be credible, which it does not, the statement he claims he made to Norris before signing the Waiver, namely, "Can I have a lawyer"—was not an unequivocal request for counsel within the meaning of *Davis* and its progeny. *See* 2 W. LaFave, J. Israel & N. King, *Criminal Procedure*, § 6.9(g) at 609–12 & n. 148 (2d ed. 1999 & 2003 Supp.).

S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Syslo,* 303 F.3d at 866; *Tuttle,* 2002 SD 94 at ¶ 22, 650 N.W.2d at 31.

■■■ [¶ 22] After reviewing the record and assessing the credibility of the witnesses who testified, the Court is unable to find that the requisite coercive or over-reaching conduct was present to negate Eastman's August 5th waiver or make his statements to detectives that day involuntary. No threats or promises were made to Eastman and no undue influence or pressure was exerted on him. The duration, tone and overall atmosphere of the interview were not hostile or coercive. The record indicates that his will was not overborne. Instead, he cooperated with detectives, answered the questions posed to him, and freely shared detailed information about what he had done on the day in question and even drew a picture of where he and T.B. had sex.

[¶ 23] Although Norris did say that he would send his file to the U.S. Attorney's Office "as is" after Eastman inquired about a "public defender", nevertheless, Eastman's subsequent actions and conduct (maintaining that he did not rape T.B. and had done nothing wrong, showing Norris the hickeys she gave him, expressing his willingness to "talk to you guys" and executing the Waiver itself) dispel any notion that Eastman was manipulated or improperly influenced and demonstrate that he made an unconstrained and autonomous decision to engage in uncounseled discussions with detectives about what happened. On this record, Eastman's waiver and inculpatory statements were not the product of coercive interrogation or overreaching

on the part of detectives. *Syslo,* 303 F.3d at 866–68; *United States v. Galceran,* 301 F.3d 927, 931 (8th Cir.2002). Because Norris and LeBeau took no action that could objectively be considered as coercion or overstepping their bounds, there is nothing to refute the voluntariness of Eastman's waiver and incriminatory statements. The Government has thus established, by a preponderance of the evidence, that Eastman's waiver and the statements he made were obtained voluntarily and in compliance with the Constitution.[7]

### C.

[¶ 24] Having determined that detectives did not overbear Eastman's will or critically impair his capacity for self-determination, the Court must now decide whether Eastman's August 5th waiver of his rights was a "knowing" and "intelligent" one.

■■■ [¶ 25] Eastman was advised of his *Miranda* rights and after doing so, stated that he understood his rights [8] and waived them in writing. The written Waiver itself constitutes strong evidence that Eastman had a clear understanding of his rights and intended to and did give up the same. *Butler,* 441 U.S. at 373, 99 S.Ct. 1755 ("an express written . . . statement of waiver of the right to remain silent or the right to counsel is usually strong proof of the validity of that waiver . . . ."). In addition, Eastman's educational background (a high school graduate), his prior experiences with the criminal justice system, and his insistence that the sexual relations he and T.B. had were consensual all weigh

7. Because the burden of proving the voluntariness of a confession is the same as the burden for showing the voluntariness of a *Miranda* waiver, *Colorado v. Connelly,* 479 U.S. 157, 169–70, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), the Court finds and concludes that Eastman's inculpatory statements were

voluntary under both 18 U.S.C. § 3501 and the Fifth Amendment.

8. After Eastman was informed of his rights and he said he understood them, Norris wrote "yes" on the Advise of Rights form. *See* MH Ex. 1.

heavily in favor of a valid waiver. Based on the entirety of the record, there can be little doubt that the Government has met its burden of proving, by a preponderance of the evidence, that Eastman knowingly and intelligently waived his *Miranda* rights before being questioned and making incriminatory remarks to Norris and Le-Beau on August 5th.

## VII.

[¶ 26] Shortly before the interview ended, Norris asked Eastman for a buccal swab. After Norris explained what a buccal swab was, Eastman said "okay". Norris then showed Eastman what to do. In response, Eastman proceeded to obtain a swabbing sample from his own mouth and hand the same over to Norris. Eastman contends that the swab was obtained illegally as a "fruit of the poisonous tree" or in violation of Constitutional strictures.

[¶ 27] The Court has already concluded that Eastman's statements to Norris and LeBeau were voluntary and in compliance with the Fifth Amendment and § 3501. *See Ante*, at 1020 & n. 7. The only question thus remaining is whether the buccal swabs were taken in violation of Eastman's Fourth Amendment rights.

[¶ 28] Whether a suspect consented to the search of his person, or in this case, voluntarily provided a buccal swab, is an issue that the Government has the burden of proving and must be resolved by examining the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 226–27, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *see also United States v. Mendenhall*, 446 U.S. 544, 557, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). When determining the propriety of a consent claim, both the characteristics of the accused and the environment in which the consent was allegedly given must be considered. *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir.2000); *United States*

*v. Chaidez*, 906 F.2d 377, 381–82 (8th Cir. 1990).

[¶ 29] Here, Eastman was a 19–year–old high school graduate at the time he was asked to provide a buccal swab and was neither intoxicated nor impaired to the extent that he was unable to exercise a free choice. He had been previously arrested and therefore was familiar with the protections afforded to criminal suspects and had been informed and had waived his *Miranda* rights and talked to law enforcement officers for more than an hour before the buccal swab request was made. He was not subjected to lengthy interrogation or threatened, physically intimidated or punished by Norris and LeBeau. No promises or misrepresentations were made to him and no subtle forms of coercion were used that might flaw his judgment. *See United States v. Ramey*, 711 F.2d 104, 107–08 (8th Cir.1983). The fact that the request was made while he was in custody, while relevant, is not enough, in this case, to vitiate the voluntariness of Eastman's consent. *See United States v. Watson*, 423 U.S. 411, 424–25 & n. 14, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *see also Bradley*, 234 F.3d at 366–67; *United States v. Miller*, 20 F.3d 926, 930–31 (8th Cir.), *cert. denied*, 513 U.S. 886, 115 S.Ct. 226, 130 L.Ed.2d 152 (1994).

[¶ 30] Yet even if there was not express or implied consent given, the Court is nonetheless satisfied that the buccal swab evidence taken from him would have been inevitably discovered by lawful means without reference to any asserted Fourth Amendment violation. *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *see also United States v. Glenn*, 152 F.3d 1047, 1049–50 (8th Cir.1998); *United States v. Hammons*, 152 F.3d 1025, 1029–30 (8th Cir.1998), *cert. denied*, 525 U.S. 1092, 119 S.Ct. 849, 142 L.Ed.2d 703 (1999). The

Government routinely makes application to the Court for search warrants to obtain bodily samples of rape suspects. In light of the charge and the information known to law enforcement authorities before the August 5th interview, the Court is confident that the Government would have requested, and ultimately been issued, a search warrant authorizing the taking of buccal swabs from Eastman for the purpose of confirming or dispelling, through comparative DNA analysis, the rape allegations. *Red Bird I*, 146 F.Supp.2d at 1003, 1010, *aff'd*, *Red Bird II*, 287 F.3d at 712, 716. This being the case, the buccal swab evidence Eastman provided, like the statements he gave that day, is admissible at trial. *Id.*

## VIII.

[¶ 31] Lastly, Eastman maintains that the photographs taken of him, following his arrest and during custodial interrogation, should be suppressed under the Fourth Amendment.[9]

[¶ 32] Since 1974, it has been clear that the legal arrest of a person (i.e., one made with authority and based on probable cause) does, for at least for a reasonable time and to a reasonable extent, take his own privacy out of the realm of protection from the interest police have in obtaining evidence. *United States v. Edwards*, 415

U.S. 800, 804–09, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974); *United States v. Robinson*, 414 U.S. 218, 235–37, 94 S.Ct. 467, 38 L.Ed.2d 427 (1974); 3 W. LaFave, *Search and Seizure*, § 5.3(a) at 108–19 (3d ed. 1996 & 2003 Supp.). Thus, if a person has been properly arrested, it is of little significance whether certain types of in-custody investigation, such as fingerprinting and photographing, constitute a Fourth Amendment search and seizure; the investigation is lawful in any event because a valid arrest was made. · LaFave, §§ 2.6(a), 5.3(c) at 568 & n. 9, 130–34 & nn. 103–15; *see also id.* § 9.7(b) at 334–37. On the other hand, if a person is illegally arrested and provides investigatory evidence while in custody, the evidence is inadmissible as the "fruit" of an illegal seizure regardless of whether the post-seizure conduct, on the part of police, is in fact a search. *See Davis v. Mississippi*, 394 U.S. 721, 726–28, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *see also United States v. Crews*, 445 U.S. 463, 474–77, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980).

 [¶ 33] Eastman does not challenge the validity of his tribal arrest or contend that his detention, at the time Norris photographed him, was unlawful. As such, it matters not whether the photographs taken of him amounted to a search or seizure—Eastman's Fourth Amendment

9. Eastman's Fifth Amendment privilege against self-incrimination was not implicated by the taking of the photographs. The privilege protects an accused only from being compelled to testify against himself or otherwise provide the Government with evidence of a testimonial or communicative nature. *Schmerber v. California*, 384 U.S. 757, 761, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). After *Schmerber* was decided, the Supreme Court held that requiring a defendant to stand in a lineup would not violate the privilege. *United States v. Wade*, 388 U.S. 218, 221–22, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). In doing so, the *Wade* Court explained that "compelling the accused merely to exhibit his person for

observation ... involves no compulsion of the accused to give evidence having testimonial significance. It is compulsion of the accused to exhibit his physical characteristics, not compulsion to disclose any knowledge he might have." 388 U.S. at 222, 87 S.Ct. 1926. Similarly, in this case, the photographing of Eastman did not require him to disclose evidence of a testimonial nature. In fact, the *Wade* and *Schmerber* Courts both recognized that most federal and state courts had concluded that the privilege did not protect against compulsion to submit to photography. *Wade*, 388 U.S. at 223, 87 S.Ct. 1926; *Schmerber*, 384 U.S. at 764, 86 S.Ct. 1826.

rights were not violated. *Ludwig v. State,* 872 S.W.2d 771, 775 (Tex.App.—Waco 1994), *aff'd,* 931 S.W.2d 239 (Tex.Crim. App.1996); *Burton v. Foti,* Civ. A No. 87–3307 1988 WL 40263 at **3–4 (E.D.La. Apr. 28, 1988); *People v. Peoples,* 200 Colo. 509, 511–12, 616 P.2d 131, 133 (1980); LaFave, § 5.3(c) at 132 & n. 107; *see also United States v. Mara,* 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973) (handwriting exemplars); *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (voice exemplars) (collectively indicating that other investigatory procedures, intended to identify the defendant and connect him with certain criminal activity, are constitutionally permissible after a lawful arrest has been made, because they do not constitute a search or seizure).

## IX.

[¶ 34] Based on the foregoing, and in accordance with § 636(b)(1), it is hereby

[¶ 35] RECOMMENDED that Eastman's Motion to Suppress Statements and Physical Evidence, Docket No. 30, be DENIED in all respects.

## NOTICE

**Failure to file written objections to the within and foregoing Report and Recommendation for disposition within two business days from the date of service shall bar an aggrieved party from attacking such Report and Recommendations before the assigned United States District Judge.** *See* **28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72.**[10]

---

**10.** The parties stipulated on the record to reducing the time period for objecting to the Report and Recommendation from ten days to two days. MH Tr. 90.