THARP, District Judge,
dissenting.
This is a case in which the Court affirms the suppression of custodial statements made by a defendant who did not invoke his right to counsel and where the police conduct on which suppression was premised did not constitute interrogation but rather attempted to facilitate the suspect’s desire to communicate with counsel. This result turns Miranda’s prophylactic rules inside out, and I therefore respectfully dissent.
I.
The facts are generally not in dispute but bear further review. After being shot *949 while fleeing from police, Hunter was taken to the hospital, accompanied by Detective Gene Karzin. At the hospital, while medical personnel attended to Hunter, Karzin sat quietly in the room. Only when Hunter asked if a police officer was present did Karzin speak to Hunter; at that point, he identified himself and advised Hunter of his rights.[1] Hunter indicated that he understood his rights and asked Karzin what he was charged with. Karzin asked whether Hunter was willing to talk to him about what happened, and Hunter said that he was willing to talk to Karzin, but just wanted a minute to think.[2] Detective Karzin, who did not know the facts relating to Hunter’s shooting and arrest, asked a police officer in the hallway about Hunter’s situation and was advised only that police had found a gun at the scene. Karzin then relayed this information to Hunter, who responded not by invoking his right to remain silent, or requesting counsel, but by saying, “So you have me for being a felon in possession of a firearm?” Detective Karzin affirmed that appeared to be the case, and also testified that Hunter appeared to be relieved that was the charge he was facing. (Tr. at 25:7-11). Hunter next asked Karzin if he would call his mother, his father, and his attorney, and provided the numbers for his parents but not his attorney. Karzin posed a single follow-up question to this request, asking Hunter what he wanted Karzin to tell “these people.” Hunter did not respond that he wanted Karzin to tell the lawyer that Hunter wanted to consult with him; he had the same message for the lawyer that he had for his parents: “Tell them that I’ve been shot.”
After this exchange, Hunter was taken for a CAT scan, during which he asked a technician whether Detective Karzin was still in the room. Understanding Hunter to be asking to speak with Karzin, the technician advised Hunter that he would be able to talk to the police after the CAT scan had been completed. As Hunter was wheeled back on a gurney to the initial treatment room, he continued to ask if Karzin was present. At that point, other investigators (Dyan Morrisey and Chris George) assigned to the case had arrived at the hospital and took over for Detective Karzin. Before leaving the hospital, Kar-zin introduced them to Hunter. Karzin also told the new arrivals that Hunter had *950 asked him to call his parents and Herbert Schultz, his attorney, and to tell them that he had been shot. Before they questioned Hunter, Morrisey and George subsequently advised Hunter of his Miranda rights (as had Karzin), and Hunter made the incriminating statements that he later sought to suppress. Hunter never asked Morrisey or George whether anyone had contacted his parents or his attorney, nor did he indicate in any way that he wished to consult with an attorney, even though he asked the investigators whether they knew Schultz.
II.
To invoke the Miranda right to counsel, “the suspect must unambiguously request counsel.” Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). The majority views Hunter’s request that Karzin call his attorney to be an unambiguous request for counsel, but in so concluding I believe that the majority gives insufficient weight to the factual context — both before and after this statement was made — necessary to evaluate the import of the suspect’s reference to his attorney.
The majority bases its opinion almost entirely on Hunter’s use of a single word: “can.” By using the word “can,” the majority concludes, Hunter was “inquiring into [his] present ability to be ‘able to’ obtain a lawyer or to ‘have the opportunity or possibility to’ obtain a lawyer.” Op. at 944. I do not dispute the majority’s definition, but as an initial matter it is far from clear that an inquiry into one’s present ability to obtain a lawyer constitutes an unambiguous statement of one’s desire to consult with an attorney. Ability is not a synonym of desire; viewed in isolation, “can I have a lawyer” does not necessarily mean the same thing as “I want a lawyer.” It might, but that question cannot be answered simply by consulting a dictionary. The majority cites several cases in which this Circuit has treated references to counsel using the word “can” as an invocation of the right to counsel, and I agree, based on the facts of those cases, that the defendant was invoking the right to counsel. Other cases, however, demonstrate that a suspect’s use of “can” does not always constitute an unequivocal invocation of the right to counsel. Lord v. Duckworth, 29 F.3d 1216 (7th Cir.1994), illustrates the point perfectly. In Lord, this Court held that a suspect’s statement to police that “I can’t afford a lawyer, but is there any way I can get one?” was not sufficiently clear to constitute an invocation of the right to counsel, holding that the statement “lacked the clear implication of a present desire to consult with counsel.” Id. at 1221 (emphasis added). See also, e.g., Dormire v. Wilkinson, 249 F.3d 801, 805 (8th Cir.2001) (“‘Could I call my lawyer’ was not an unambiguous request for counsel.”); United States v. Dixon, No. 8:10-cr-135-T-30MAP, 2010 WL 5209359, at *4 (M.D.Fla. Nov. 18, 2010) (“Can I have my lawyer here while we talk” ambiguous as to ability or desire); United States v. Cook, No. 07-CR-6195 CJS, 2008 WL 728883, at *14 (W.D.N.Y. Mar. 17, 2008) (suspect’s question if he would be able to call attorney not an unambiguous invocation of right to counsel); United States v. Eastman, 256 F.Supp.2d 1012, 1019 n. 6 (D.S.D.2003) (“Can I have a lawyer” held not to be an unambiguous invocation of right to counsel). If, as the majority maintains, “can I have a lawyer” is an unambiguous invocation of the right to counsel, how can so many courts — including this one — have found equivalent statements to be ambiguous?
The answer is context. As this Court has repeatedly emphasized, we do not give talismanic import to the words used by a *951 suspect; the analysis of whether a suspect has unambiguously invoked the right to counsel “does not end with words alone; ... we also consider the circumstances in which the statement was made.” United States v. Hampton, 675 F.3d 720, 727 (7th Cir.2012) (quoting United States v. Shabaz, 579 F.3d 815, 819 (7th Cir.2009)). The majority opinion, however, devotes just two sentences to the assessment of the context in which Hunter’s request was made. Op. at 946-47. The first notes that Hunter asked Karzin to call his attorney “only after he had been arrested, handcuffed to a hospital gurney, read his Miranda rights, and asked if he wanted to speak to a police detective.” That a suspect was questioned in custody, however, says only that Miranda applies (absent custodial interrogation, it does not); the facts that establish that precondition shine no light on whether the suspect unambiguously invoked his right to counsel. The second appears to characterize Hunter’s statement that he wanted “a minute to think” before talking about the incident as uncertainty about whether to talk to Karzin. See Op. at 946-47 and supra note 2. The uncontroverted evidence, however, is that Hunter told Karzin that he was willing to talk to him. Hunter did not say that he wanted a minute to think before deciding whether to talk to Karzin — rather, he initiated the dialog with Karzin in the first place. The record before us provides no basis to infer that Hunter’s statement that he wanted to think a minute must, or should, be interpreted as a qualification on his willingness to talk to Kar-zin — particularly when he proceeded to do so.
Even if one accepts that “can you call my lawyer,” standing alone, constitutes an unambiguous invocation of the right to counsel, when, as here, that statement is made after a suspect has sought out a police officer, agreed to talk to him, and after he has made incriminating statements to the police officer, there is at the very least a tension between these actions and the reference to counsel that reflects ambiguity in the suspect’s intentions and warrants clarification. For that reason, this Court has confirmed more than once that a suspect’s equivocation about whether or not to speak to police following Miranda warnings introduces an element of ambiguity into the analysis of what might otherwise be deemed an adequate invocation of counsel. See, e.g., Hampton, 675 F.3d at 727 (suspect’s prior agreement to talk to police a factor bearing on meaning of his purported invocations of counsel); Lord, 29 F.3d at 1221 (“is there any way I can get [a lawyer]” held ambiguous in light of prior incriminating statements made by suspect).
The ambiguity arising from Hunter’s mixed signals (accepting, arguendo, that Hunter intended to invoke his right to counsel when he asked Karzin to call Schultz) is compounded by the fact — which the majority opinion does not discuss— that Hunter did not ask Karzin to call just his lawyer; his request came on the heels of his request that Karzin call both of his parents as well. Stand in Detective Kar-zin’s shoes at that point: Hunter had sought Karzin out, agreed to talk, made incriminating statements, and then asked the detective to call his mother, father, and attorney. In that context, is it perfectly clear that Hunter wanted Karzin to call Schultz because he did not want to talk any further with Karzin? Other courts have found ambiguity in requests to call both parent and attorney — see, e.g., Jones v. McNeil, No. 3:07-cv-146-J-32, 2010 WL 893816, at *9 (M.D.Fla. Mar. 9, 2010) (suspect’s statement that he wanted to speak “to his mother, his attorney, and [a detective]” did not unambiguously invoke right to counsel); Glover v. Portuondo, No. 96 *952 Civ. 7616(JGK), 1999 WL 349936, at *3, *5 (S.D.N.Y. May 28, 1999) (suspect stopped interrogation to request lawyer via a friend, and then through mother; statements made after detective asked for phone numbers and while dialing not suppressed). What makes Hunter’s multifaceted request any clearer?
The majority asks, “Why else would Hunter have wanted to call his well-known criminal defense attorney other than to invoke his right to counsel?” Op. at 948. That is a curious rhetorical question, since there was another reason (to “tell them I’ve been shot”), but Hunter could have intended any number of other messages as well. Perhaps he was going to miss an appointment with Schultz; or wanted Schultz to talk with his parents about a retainer (see, e.g., Flamer v. Delaware, 68 F.3d 710, 716, 725 (3d Cir.1995) (suspect’s request to call mother in order to retain family’s counsel “failed to meet the requisite level of clarity” to constitute an unambiguous invocation of counsel), cert. denied, 516 U.S. 1088, 116 S.Ct. 807, 133 L.Ed.2d 754 (1996)); or to let Schultz know that he should start negotiating a plea bargain (see, e.g., United States v. Jardina, 747 F.2d 945, 949 (5th Cir.1984)). Who knows? We don’t, and Karzin didn’t either. The point is that there are reasonable explanations for the request other than a desire to obtain legal advice before speaking further with the police — indeed, the possibilities just set forth seem more likely than the reason that Hunter actually gave. The fact that we could not have predicted Hunter’s actual response to Karzin’s question only confirms that there are also many possibilities that would not even occur to us. That is precisely why the Supreme Court held in Davis that it is the suspect’s burden to make an unambiguous assertion of the right to counsel: to avoid forcing police officers “to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong.” 512 U.S. at 461, 114 S.Ct. 2350. In the context of this case, Detective Karzin couldn’t know why Hunter wanted to talk to Schultz until he asked a simple question to clarify Hunter’s ambiguous and open-ended request.
That is exactly what both the Supreme Court and this Court have repeatedly told police to do. In Davis, the Supreme Court advised police to seek clarification of a suspect’s intentions at the time of the request in order to avoid “judicial second-guessing” about whether the suspect intended to invoke his right to counsel or not. Davis, 512 U.S. at 461, 114 S.Ct. 2350 (police have no obligation to clarify an equivocal or ambiguous reference to counsel, but “it will often be good police practice ... to clarify whether or not [the suspect] actually wants an attorney”). This Circuit has time and again reinforced that message. See, e.g., United States v. Wysinger, 683 F.3d 784, 795 (7th Cir.2012) (“we encourage law enforcement officers to heed the Supreme Court’s suggestion in Davis ”); United States v. Lee, 413 F.3d 622, 626-27 (7th Cir.2005) (“We highly encourage police to follow the advice offered by the Supreme Court and take the time to clarify such issues at the time of interrogation rather than in after-the-fact arguments before the courts.”). Detective Karzin followed this advice — but still cannot escape “judicial second guessing.”
Because Detective Karzin asked an utterly benign question in response to Hunter’s request, it is clear that Hunter did not intend to invoke his right to counsel. Hunter responded not by saying, “Tell my lawyer I’d like him to come to the hospital to consult before I talk to you any further,” but by asking the detective to tell both his parents and the attorney the very *953 same thing: “Tell them I’ve been shot.”[3] As the government made the point at oral argument, if Hunter had asked Karzin, “Can you call my parents and lawyer and tell them I’ve been shot,” it is difficult to imagine that anyone would have construed Hunter’s question as an invocation of the right to counsel. Certainly it would not have been an unambiguous invocation of that right.[4]
Citing Smith v. Illinois, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984), the majority maintains that Hunter’s response cannot be considered because it came after he had unambiguously invoked his right to counsel. Op. at 945 (“courts should only consider prior context when determining whether a defendant unambiguously invoked his right to counsel”) (emphasis added). As discussed above, viewed in context Hunter’s reference to counsel was not unambiguous, but even putting that disagreement aside, the majority’s reliance on Smith as justification for ignoring Hunter’s response to Karzin’s statement remains misplaced. Neither Smith nor any other opinion of the Supreme Court or this Court holds that police may say nothing more to a suspect once he has invoked his right to counsel (even unambiguously). Smith (and Edwards, on which it builds) bars only further “interrogation” after the invocation of counsel. See Smith, 469 U.S. at 91, 105 S.Ct. 490 (“Under Miranda and Edwards, ... an accused’s postrequest responses to further interrogation may not be used to cast doubt on the clarity of his initial request for counsel.”); id. at 100, 105 S.Ct. 490 (“We hold only that ... an accused’s postrequest responses to further interrogation may not be used to cast doubt on the clarity of the initial request itself.”) (some emphasis added); Edwards v. Arizona, 451 U.S. 477, 484, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (when an accused has “expressed his desire to deal with the police only through counsel, [he is] not subject to further interrogation until counsel has been made available”) (emphasis added). Neither case bars consideration of post-request statements that are not the product of interrogation, and *954 for good reason: the Supreme Court held in Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), that absent “interrogation,” Miranda imposes no impediment to the use of a suspect’s statements. Id. at 299-300, 100 S.Ct. 1682 (“not ... all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation”). See also Edwards, 451 U.S. at 485, 101 S.Ct. 1880 (Innis established that “[ajbsent [custodial] interrogation, there would have been no infringement of the right [to counsel] that Edwards invoked”).
In holding that Smith precludes consideration of Hunter’s response to Karzin’s question in assessing whether Hunter was invoking his right to counsel, then, the majority reads Smith too broadly. Innis teaches that the timing of a suspect’s statement is not the focus of the prophylactic rules of Miranda and Edwards, but the nature of the conduct that elicited it: “the issue ... is whether the respondent was ‘interrogated’ by the police officers in violation of the respondent’s ... right to remain silent until he had consulted with a lawyer.” Innis, 446 U.S. at 298, 100 S.Ct. 1682. And “interrogation” encompasses only “words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.” Id. at 301, 100 S.Ct. 1682.[5]
The district court recognized that its inquiry should turn on whether Karzin’s question “would reasonably be intended or anticipated to lead to some incriminating response.” Reh’g Tr. at 18. That is the right question, but I respectfully submit that the district court reached the wrong answer. Detective Karzin did not “interrogate” Hunter by responding to a question that Hunter posed. Relying on Innis, this Court has previously observed that a “police officer’s response to a direct inquiry by the defendant does not constitute ‘interrogation.’ ” United States v. Briggs, 273 F.3d 737, 740 (7th Cir.2001). See also United States v. Hendrix, 509 F.3d 362, 374 (7th Cir.2007) (same, citing Briggs, 273 F.3d at 740). And in holding that a police officer’s direct question to a suspect about what he meant when he said he was “going to die,” we acknowledged in Briggs what Innis made clear: “not all direct questions [posed by police to a suspect] constitute ‘interrogation.’ Only questions that are ‘reasonably likely to elicit an incriminating response from the suspect’ are improper.” 273 F.3d at 741 (quoting Innis, 446 U.S. at 301-02, 100 S.Ct. 1682).[6]
*955 Though it agrees that Hunter’s response to Karzin’s question was not incriminating, the majority maintains that the question was “an invitation to disaster,” Op. at 947, because Hunter “could have easily responded ... with an incriminating statement.” But the interrogation test is not whether it is possible that a suspect might incriminate himself, but whether it is reasonably likely that he would do so in response to the police conduct.
To take the view that Karzin’s question was reasonably likely to elicit an incriminating response, one would have to believe it likely that Hunter would confess while simultaneously telling the police he would not talk without .a lawyer. That counterin-tuitive premise is the sole justification the majority offers for its view that Karzin’s single question constituted “interrogation.” The majority does not tell us why it is likely that Hunter, in the course of invoking his right to counsel, would tell Karzin that he had shot a police officer, and I cannot fault Detective Karzin for the evident deficit in his imagination in failing to anticipate that remote possibility. The majority’s scenario is implausible and indulging such fanciful scenarios, in my view, turns the Innis test into one that requires police to refrain from all conduct that does not foreclose the possibility of eliciting an incriminating response.
That approach is inconsistent not just with Innis, but with the myriad cases in which this Court has held that Innis permits conduct far more provocative than Detective Karzin’s single question in response to Hunter’s inquiry. Karzin’s response to Hunter pales in significance to police dialog with custodial suspects that this Court has held not to rise to the level of interrogation. See, e.g., United States v. Johnson, 680 F.3d 966, 977 (7th Cir.2012) (presenting or reciting the evidence against a suspect does not constitute interrogation, and citing cases from this and other circuits supporting that proposition); United States v. Knope, 655 F.3d 647, 652 (7th Cir.2011) (administrative questions— e.g., address of residence — do not constitute interrogation even where they lead to discovery of incriminating evidence); Hendrix, 509 F.3d at 374 (officer’s dialog with suspect about what had been found during execution of search warrant “may have aroused [suspect’s] curiosity”, but did not constitute interrogation); United States v. Shlater, 85 F.3d 1251, 1256 (7th Cir.1996) (requests for consent to search do not constitute interrogation under Innis standard). And if, as this Court held in Briggs, a police officer can directly question a suspect about what he meant when he said he was “going to die” did not constitute interrogation under Innis, it is difficult to fathom how an officer’s innocuous response to a question posed by the suspect, such as “what do you want me to tell these people?” could be deemed to undercut the right to counsel.
It cannot — and this Court’s recent decision in Hampton proves the point. In Hampton — which also happened to involve a defendant who “was arrested for unlawfully possessing a firearm as a felon after he discarded a loaded handgun during a foot chase with police” — this Court held that officers “did not violate the Miranda/Edwards rule,” 675 F.3d at 723, by asking questions to clarify the suspect’s intent to invoke counsel, even assuming that his request for counsel was unambiguous. Id. at 728. The questions police posed there following the invocation of counsel, we held, did not undercut the prophylactic safeguards Miranda and Edwards imposed because they did not constitute “an interrogation at all.” We found *956 them instead to be “just what the Supreme Court recommends that officers do in this situation.” Id. at 728. Because “no interrogation occurred” when the officers attempted to clarify the suspect’s intent, the Court considered the suspect’s further statements regarding his intention in assessing whether or not he had invoked his right to counsel — and concluded that he had not. Id. at 728-29.
The same rationale explains why this Court, in Lee, admonished police to ask clarifying questions in the context of a case in which the suspect’s reference to an attorney came in the form of a question (“Can I have an attorney?”) that the majority now says is so unambiguous as to permit no follow up at all — even follow-up that would be necessary to facilitate the suspect’s communication with counsel. See 413 F.3d at 626-27 (following that question, police should have either halted interrogation or obtained further clarification of the suspect’s intent to invoke counsel).
In the absence of interrogation, there is no reason or basis to exclude Hunter’s response to Karzin’s question from the assessment of whether Hunter’s request that Karzin call Schultz should be construed as an invocation of counsel.[7] Though the majority says that Karzin’s question was “wholly unnecessary,” even if that were the test (and, again, it is not), the question was anything but: to carry out Hunter’s request, Karzin had to know what Hunter wanted him to say. That is true even if Hunter had been invoking counsel in asking Karzin to make the call; indeed, it is arguably even more important in that context that the law enforcement official relay the right message. Why should a police officer’s attempt to accurately relay a message from a suspect to his lawyer be impermissible? Would we rather they guess?
These questions highlight what, in my view, is most problematic about suppressing Hunter’s subsequent statements: Detective Karzin’s question, by its express terms, was far more likely to facilitate Hunter’s communication with counsel than to obstruct it. The Supreme Court instituted the requirement of providing prophylactic Miranda warnings to protect, among other things, a suspect’s Fifth Amendment right to counsel. See Berghuis v. Thompkins, 560 U.S. 370, -, 130 S.Ct. 2250, 2261, 176 L.Ed.2d 1098 (2010) (“The main purpose of Miranda is to ensure that an accused is advised of and understands the right to remain silent and the right to counsel,” citing Davis, 512 U.S. at 460, 114 S.Ct. 2350). If, as the majority posits, Hunter’s request must be regarded as an expression of his desire to consult with counsel, then delivering the substance of his message to counsel plainly promotes and enhances the suspect’s exercise of that right. Karzin’s inquiry explicitly sought to do just that. The troubling irony in the majority’s opinion, then, is that it turns Miranda inside out, penalizing police for attempting to facilitate communication with counsel rather than encouraging them to do so. Surely we want police officers to relay messages to counsel when a suspect is unable to make the call themselves? But why, in light of this opinion, would they ever agree to do so?
III.
At oral argument, the government’s counsel asked: What is it about the facts *957 of this case that offends our Constitutional sensibilities? When a defendant plainly has not invoked his right to counsel and the government did nothing that was intended, or likely, to undermine that right, I do not find anything that offends my Constitutional sensibilities. By contrast, a rule that suppresses evidence is “justified only by reference to its prophylactic purpose.” Connecticut v. Barrett, 479 U.S. 523, 528, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987). When application of a prophylactic rule would dimmish, rather than enhance, the constitutional rights the rule is intended to protect, I cannot endorse that result. I therefore respectfully dissent.

. The district court found that Karzin neglected to advise Hunter that he had the right to have counsel appointed if he could not afford an attorney, but Hunter does not argue that the omission of that portion of the Miranda warning is relevant to the question of whether his statements should be suppressed. Indeed, it is Hunter’s reference to an attorney who was already representing him (albeit in connection with other charges) that creates the issue at bar, not that Hunter wanted, but was not advised of his right to, appointed counsel.

. The district court’s account of Detective Karzin’s testimony on this point appears to be mistaken in one respect. The district court recalled Detective Karzin as testifying that, after indicating that he was willing to talk to Karzin, Hunter "almost immediately said, ‘But I want to think about this.' ” (Tr. 182). In fact, Karzin testified only that Hunter said “he just wanted a minute to think.” (Tr. 19). Karzin’s report similarly indicates that Hunter said only that he wanted a minute to think before talking to Karzin, not that he wanted to think about whether or not to speak to Karzin. The two statements are not the same; the statement Hunter actually made (suggesting only that Hunter wanted to collect his thoughts before talking to the officer) was not at all inconsistent with his statement that he was willing to speak to Karzin, while the version on which the district court premised its ruling suggests that Hunter had never affirmatively acknowledged his willingness to talk to Karzin. Thus, the district court’s imprecise recollection of this testimony may well have influenced its assessment of Hunter's request as an invocation of his right to counsel.

. Hunter's subsequent conduct reinforces the point. While a CAT scan was being taken, Hunter affirmatively asked again if Karzin was present, only to be told by medical staff (who clearly understood his question to indicate that he wanted to talk to Karzin) that he would be able to talk to the police after the CAT scan procedure had been completed. And, of course, we know that Hunter, before talking to other detectives, did not (as one would expect had he intended to invoke his right to counsel) inquire about the status of his request that Karzin call Schultz and did not invoke his right to counsel when other detectives again provided Miranda warnings before they attempted to interview Hunter. Instead, consistent with his earlier statement to Karzin that he was willing to talk to the police, he voluntarily answered their questions. This Court has repeatedly held that the fact that a suspect "did not pursue the matter any further” after an initial inquiry about counsel is an important factor in assessing whether that inquiry constituted an invocation of counsel. Shabaz, 579 F.3d at 819 (quoting Lord, 29 F.3d at 1221). See also, e.g., United States v. Walker, 272 F.3d 407, 413-14 (7th Cir.2001) (suspect's ambiguous statement interpreted in light of his later agreement that police could "go ahead” with their questioning).

. The district court agreed that Hunter’s reference to counsel was ambiguous when viewed in the context of his statement, "Tell them I've been shot." Tr. 184. Indeed, the district court criticized Karzin for not asking additional follow-up questions. See Tr. 184-85 ("Now, if the officer had said at that time, Well now wait a minute. You said you wanted to talk — you wanted me to call Herb Schultz. What does that mean? Do you want to talk to us without talking to him? ... In other words, some clarification of that ambiguity that was created by the officer’s question, not by the defendant's original statement.”).

. Smith, which was animated by the need to prevent "the authorities through badgering or overreaching — explicit or subtle, deliberate or unintentional [from wearing] down the accused and persuading] him to incriminate himself not withstanding his earlier request for counsel’s assistance,” 469 U.S. at 95, 105 S.Ct. 490 (internal citations omitted), is not inconsistent. There, the Supreme Court concluded that there was "subsequent interrogation” by the police following an unequivocal invocation of the right to counsel that included, among other things, misstatements that suggested to the suspect that he "had to” talk to police. Id. at 99 & n. 8, 105 S.Ct. 490. The concerns that animated the Supreme Court’s opinion in Smith do not exist where, as here, police do not interrogate — that is, where they do not engage in conduct that is reasonably likely to elicit incriminating statements.

. The majority notes, Op. at 947-48, n.l, that the facts of Innis itself are different than those in this case, but that says nothing about the relevance of the test that Innis established to assess whether police conduct constitutes interrogation. The majority does not question the relevance or continuing vitality of the Innis test. And in any event, the majority’s view that Karzin’s express question to Hunter distinguishes this case from Innis cannot be reconciled with this Court’s holding in Briggs, where this Court expressly rejected the notion that where a police officer asks a suspect a *955 direct question, there is necessarily interrogation.

. The majority notes (Op. at 945) that the government does not contend that Hunter’s response to Karzin’s question constitutes a waiver of an invocation of the right to counsel. That is correct, but beside the point. Hunter didn't waive his right to counsel after invoking it; as his response confirms, he didn’t invoke the right in the first place.