In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-4355

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LARRY HENDRIX,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 06 CR 54—**Barbara B. Crabb**, *Chief Judge.*

ARGUED SEPTEMBER 19, 2007—DECIDED DECEMBER 3, 2007

Before BAUER, MANION, and WOOD, *Circuit Judges.*

BAUER, *Circuit Judge.* A jury convicted Larry Hendrix of possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). The district court sentenced him to 262 months' imprisonment. Hendrix challenges his conviction, claiming that the district court erred in (1) finding that the prosecution made a race-neutral showing for striking two African-Americans during voir dire; (2) allowing testimonial evidence that a judge approved a warrant to search Hendrix's home; and (3) concluding that Hendrix was not subject to interrogation under *Miranda*. Hendrix also challenges his sentence. For the following reasons, we affirm.

## I.  Background

On February 9, 2006, agents of the Dane County Narcotics and Gang Task Force received information from a confidential informant about a man named "Chase," whom the informant later identified as Larry Hendrix. The informant told the agents that earlier that day he was at Hendrix's apartment and saw Hendrix move two firearms from the kitchen table to the back of the apartment where the bedrooms were located. The informant also told the agents that Hendrix was supposed to meet a man named "Meat" to sell heroin later that day. Detective Steven Wegner obtained a search warrant for Hendrix's apartment at 220 Deer Valley Road, Apartment 1, in Madison, Wisconsin.

That evening, the agents arrived at Hendrix's apartment and took Hendrix into custody on an outstanding arrest warrant for a traffic offense. After Detective Wegner read the search warrant to Hendrix, Officer Lester Moore transported Hendrix to Dane County Jail to book him on the traffic offense. The other agents, including Detective Wegner and Detective Bill Hendrickson, executed the search warrant and confiscated a sawed-off shotgun and ammunition, which they found in a back bedroom.

While Officer Moore booked Hendrix at the jail, he learned that the agents who executed the search warrant had recovered a firearm and ammunition at Hendrix's apartment. Hendrix was anxious as he waited in the booking area, and repeatedly asked Officer Moore about the charges against him. When Officer Moore told him that items found at his residence would lead to more charges against him, Hendrix replied that "all they were going to find would be a pistol." Officer Moore told Hendrix that the agents found something larger than a pistol, to which Hendrix responded that he "call[ed] everything a pistol," and that he had only obtained the weapon because

his "apartment had been broken into . . . and [that he] needed some protection."

Hendrix was indicted under 18 U.S.C. § 922(g)(1) for possession of a firearm and ammunition as a convicted felon. Hendrix moved to suppress his statements made to Officer Moore during booking, and an evidentiary hearing was held on July 7, 2006. A magistrate judge found that Hendrix's post-arrest statements were volunteered and that Officer Moore did not subject Hendrix to questioning that afforded Hendrix protection under *Miranda*. The magistrate judge recommended that Hendrix's motion be denied. The district court accepted and adopted this recommendation, noting that the record showed that Hendrix was the one that did most of the talking and that Officer Moore merely responded in an effort to calm Hendrix down.[1]

Voir dire took place on September 5, 2006. The venire consisted of thirty-three people, and after questioning by the court, both sides exercised a combined total of eighteen peremptory challenges. The court noted that the prosecution used two of its challenges to exclude Juror Nos. 22 and 16, the only African-Americans in the venire. Recognizing that a *prima facie* case of discrimination had been established, pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), the court *sua sponte* called both parties to the bench for a sidebar. The prosecution offered an explanation as to why he struck those particular jurors, stating, "Mr. Woodland, number 22, he said his stepson is in prison for armed robbery, and that gave me pause. I struck from

---

[1] Hendrix also moved to quash the search warrant and for the government to disclose the identity of the confidential informant. Both motions were also denied, as recommended by the magistrate judge, and adopted by the district court.

the panel everyone that I could that has relatives in pris-
on . . . Ms. Hairston, number 16, who said her brother
was in prison for murder . . . . " The prosecution also noted
that he struck Juror No. 13, Ms. Strock, a Caucasian
woman, "who said her [step]father was in prison." Defense
counsel expressed concern that the only two African-
Americans were gone, stating "[it] leaves us with a jury
without any minorities. And Mr. Hendrix is obviously
African-American, and so that gives us some concern."
Defense counsel did not address the fact that Juror
Martin, a Caucasian woman, was not struck from the
panel, despite the fact that she had a brother who was
sent to a reform school for armed robbery at age sixteen.

The prosecution then added that Mr. Woodland was "one
of those CSI guys," and that he had "great concern about
the jurors who watch a lot of CSI," because it was a
"straightforward case."[2] Additionally, the prosecution
noted that Mr. Woodland had a friend who was a Wis-
consin Department of Corrections officer, and Ms. Hairston
had a good friend who was a police officer. Defense coun-
sel did not respond, and the court stated, "Okay, I think
that's a legitimate showing," and excused Jurors Wood-
land, Hairston, Strock and fifteen other individuals as a
result of the parties' peremptory challenges. When voir
dire ended, defense counsel requested a copy of the
transcript of the proceeding.

The trial began on September 11, 2006. Before opening
statements, defense counsel stated on the record that he
wanted "the record to be clear the defense has made . . . a
challenge to the [prosecution's] use of its peremptory
challenges under *Batson*," to which the court replied,

---

[2] "CSI" refers to the television show "*CSI: Crime Scene Investiga-
tion.*"

"Thank you."[3]

During opening statements, the prosecution told the jury that police officers had information to believe that Hendrix had a firearm in his apartment, and obtained a search warrant from a judge to search the apartment. After opening statements ended, defense counsel requested a sidebar, and moved to enjoin the prosecution from referring to the fact that a judge approved the search warrant for Hendrix's apartment.[4] The court granted defense counsel's motion, noting that the prosecution was allowed to say that the officers had a warrant, but was not permitted to refer to a judge's approval of the warrant.

The prosecution's first witness was Detective Hendrickson. During direct examination, the prosecution asked, "Prior to the execution of [the] warrant, had the warrant been approved?" Detective Hendrickson answered, "Yes, by a Dane County Judge, yes." After the detective finished testifying, defense counsel moved for a mistrial, arguing that the prosecution was not permitted to elicit testimony about a judge's approval of the search warrant. The court stated, "I did say that [the prosecution] couldn't mention the judge approved [the warrant]." The court did not rule explicitly on Hendrix's motion for mistrial, and the trial continued.

The jury found Hendrix guilty. On September 28, 2006, Hendrix filed a motion for a new trial, arguing that the district court denied him a fair trial in finding that the

---

[3] In its brief, the prosecution argues that defense counsel's statements during the *Batson* inquiry and before trial did not properly preserve a *Batson* claim, requiring us to review the district court's ruling for plain error. We decline to do so.

[4] Defense counsel argued that the jury could infer that a judge had already determined that evidence to the crime existed.

prosecution made a race-neutral showing in striking the only two African-Americans in the venire, and in denying Hendrix's motion for a mistrial after the prosecution made improper references to a judge's approval of a search warrant.

On November 30, 2006, the district court denied Hendrix's motion for new trial. The court held that the prosecution's explanation of its strikes were race-neutral, credible, and lacked purposeful discrimination under *Batson*. The court found that the prosecution's explanations were sufficient, in that the two African-American jurors and one Caucasian juror were struck because they might be biased against the government, due to having relatives that had been convicted of serious crimes. The court also noted that in his motion for a new trial, Hendrix argued for the first time that the prosecution did not strike all of the jurors in the venire with relatives in prison, referring to Juror Martin. The court explained: "If this is true, [Hendrix] did not bring it to my attention at the sidebar conference, when [the prosecution] could have responded and when any problem could have been cured."

Furthermore, the court held that Hendrix did not raise any specific concerns at the sidebar during voir dire about the prosecution's reasons for striking the jurors, nor did he identify any new grounds for his challenge on the morning of trial, despite having a week to review the voir dire transcript. The court found that Hendrix failed to show during voir dire that the prosecution's exercise of its peremptory challenges violated his right to equal protection, Hendrix waived the right to make any additional showings, and the reasons given by the prosecution for

striking the two African-American jurors were legitimate.[5]

The district court also held that the prosecution's improper references to the search warrant were limited, and any error was harmless. The court noted that the prosecution should not have asked Detective Hendrickson about whether the search warrant had been approved, but that the testimony "was not elaborated on and, given the strong evidence against [Hendrix], it would not have had any effect on the outcome of the trial."

In preparing the pre-sentencing report ("PSR"), the probation office found that Hendrix qualified as an Armed Career Criminal under 18 U.S.C. § 924(e), which mandates a minimum fifteen-year prison sentence for anyone possessing a firearm after three prior convictions for violent felonies or serious drug offenses.[6] The PSR calculated a sentencing guideline range of 262 to 327 months' imprisonment, based on a category six criminal history and an offense level of 34.[7] At the sentencing hearing, Hendrix objected to the PSR's recommendation to sentence him under the Armed Career Criminal Act, because a jury had not determined that the previous convictions existed. The court agreed with the recommendations of the PSR. In determining Hendrix's sentence, the court also considered

---

[5] The court also explained that during the *Batson* inquiry, it found that the prosecution's showing was race-neutral and credible, even though it did not explicitly make those statements at that time.

[6] The PSR indicated that Hendrix's previous convictions included two burglaries and possession with intent to distribute cocaine.

[7] Hendrix's offense level of 34, pursuant to U.S.S.G. §4B1.4(b)(3)(A), reflected an 8-point enhancement because the firearm possessed by Hendrix was a shotgun having a barrel of less than 18 inches long, as described in 26 U.S.C. §5845(a).

the relevant 18 U.S.C. § 3553(a) factors, and sentenced him to 262 months' imprisonment. Hendrix timely filed this appeal.

## II.  Discussion

### A.  The *Batson* Challenge.

Hendrix argues that, under *Batson*, the prosecution's race-based exercise of its peremptory strikes deprived Hendrix of his right to equal protection of the law. Hendrix contends that (1) the prosecution's strikes were not race-neutral, because the prosecution did not strike Juror Martin—who is Caucasian—even though she had a brother who went to reform school for armed robbery[8]; (2) the prosecution's recognition that Jurors Woodland and Hairston had friends in law enforcement should have been appealing to the prosecution, and therefore undercuts its assertion that the strikes were race-neutral; (3) the prosecution's "sudden proffer of a new explanation" that Juror Woodland was "one of those CSI guys" was pretextual, because other white jurors on the panel who watched the show were not struck from the panel; and (4) the district court erred when it did not explain why it was satisfied with the prosecution's explanations of striking the African-American jurors.

*Batson* sets forth a three-step analysis that precludes a prosecutor from striking a juror based on race under the Equal Protection Clause. First, the defendant must establish a *prima facie* case that the strike was racially motivated. The burden then shifts to the prosecution to articulate race-neutral reasons for the strike. Finally, the

---

[8]  Later in his brief, Hendrix incorrectly refers to Juror Martin's brother as being "incarcerated" for armed robbery.

trial judge must assess the credibility of the prosecution's explanation and determine if the defendant has established purposeful discrimination. *Batson v. Kentucky*, 476 U.S. 79, 96-98 (1986); *see also Lamon v. Boatwright*, 467 F.3d 1097, 1099 (7th Cir. 2006). The ultimate burden of persuasion regarding racial motivation rests with the opponent of the strike. *United States v. Jones*, 224 F.3d 621, 624 (7th Cir. 2000) (internal quotations omitted) (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995)).

Not every strike of a racial minority is a violation of *Batson*. *Jones*, 224 F.3d at 624. A prosecutor's motives are a question of fact, *United States v. George*, 363 F.3d 666, 673 (7th Cir. 2004), to be determined by the trial judge, who is in the best position to evaluate the demeanor of the attorney exercising the challenge. *Hernandez v. New York*, 500 U.S. 352, 365 (1991). Because these are determinations of credibility, we review a district court's resolution of a *Batson* challenge for clear error. *George*, 363 F.3d at 673; *see also United States v. McMahan*, 495 F.3d 410, 420 (7th Cir. 2007). We must have a firm and definite conviction that a mistake was made before reversing a trial court's *Batson* ruling. *United States v. White*, 416 F.3d 634, 640 (7th Cir. 2005). We must keep in mind, however, that "[o]nce the trial judge has been persuaded of the neutrality of the prosecutor's reason for striking a juror, we have no basis for reversal on appeal unless the reason given is completely outlandish or there is other evidence which demonstrated its falsity." *United States v. Griffin*, 194 F.3d 808, 826 (7th Cir. 1999) (internal quotations omitted) (quoting *Morse v. Hanks*, 172 F.3d 983, 985 (7th Cir. 1999)).

At the first stage of the *Batson* analysis, the burden is low, requiring only circumstances raising a suspicion that discrimination occurred, even where those circumstances are insufficient to indicate that it is more likely

than not that the challenges were used to discriminate. *United States v. Stephens*, 421 F.3d 503, 512 (7th Cir. 2005) (citing *Johnson v. California*, 545 U.S. 162, 170 (2005)). We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a *prima facie* case of discrimination against black jurors. *Batson*, 476 U.S. at 97. Acknowledging that the only two African-Americans had been struck from the venire by the prosecution, the court found that a *prima facie* case under *Batson* had been established.

At the second stage of the *Batson* inquiry, the burden shifts to the prosecution to make a race-neutral explanation for its strikes. Unless a discriminatory intent is inherent in the prosecution's explanation, the reason offered will be deemed race-neutral. *Batson*, 476 U.S. at 98 n.20.; *see also George*, 363 F.3d at 674 (citing *United States v. Jordan*, 223 F.3d 676, 687 (7th Cir. 2000)) ("The [prosecution's] proffered reason for the strike need not be particularly persuasive, or even based on quantifiable data, so long as it is not pretextual.").

The prosecution explained that Jurors Woodland, Hairston, and Strock all had relatives in prison, which is a valid and race-neutral basis for the strikes. Jurors with relatives in prison may sympathize with a defendant, or have feelings of animosity against the prosecution. *See United States v. Lewis*, 117 F.3d 980, 983 (7th Cir. 1997) (finding that the dismissal of a juror who had two relatives in prison was a race-neutral explanation); *United States v. Hughes*, 970 F.2d 227, 230-31 (7th Cir. 1992) (finding that the fact that a juror's cousin had served time for a drug offense was a race-neutral reason). Hendrix contends that the strikes were not race-neutral because Juror Martin remained on the panel. Juror Martin had a

brother who was sent to reform school when he was sixteen years old. The prosecution may recognize that a juvenile sent to reform school is in a different category than an adult who is sent to prison. Furthermore, Juror Strock—a Caucasian—was also struck for the same reason as Jurors Woodland and Hairston, which further illuminates the non-discriminatory nature of the prosecution's strikes and erodes notions of pretext in the prosecution's motive for the strikes.

At the last stage of a *Batson* inquiry, the court must determine whether the defendant has carried his burden of proving purposeful discrimination by the prosecution. *Purkett*, 514 U.S. at 768. The critical question in determining whether a defendant has proved purposeful discrimination at the last stage is the persuasiveness of the prosecution's justification for his strike. *Miller-El v. Cockrell*, 537 U.S. 322, 338-39 (2003) ("*Miller-El I*"). The issue is whether the trial court finds the prosecutor's race-neutral explanations to be credible. *Id.* at 339. When approaching the issue of credibility, the court assesses "how reasonable, or how improbable, the [prosecutor's] explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Coulter v. McCann*, 484 F.3d 459, 465 (7th Cir. 2007) (quoting *Miller-El I* at 339). *Batson* and its progeny direct trial judges to assess the honesty—not the accuracy—of a proffered race-neutral explanation. *Lamon*, 467 F.3d at 1101. Moreover, at the third stage, the defendant may offer additional evidence to demonstrate that the proffered justification was pretextual. *Stephens*, 421 F.3d at 510.

The district court considered all of the prosecution's explanations as to why Jurors Woodland and Hairston were struck when it found that the explanations were proper. Along with the evidence before the court at that time that two African-Americans and a Caucasian were struck for the same race-neutral reason, the court also

assessed the demeanor of the prosecutor and the honesty of his explanations. Without any specific objections or further evidence of pretext from Hendrix, the court accepted the prosecution's reasons for striking Jurors Woodland and Hairston as legitimate and race-neutral.

Furthermore, Hendrix failed to demonstrate any pretext to the court during voir dire. Although he contends on appeal that the prosecution's strikes were not race-neutral because Juror Martin was not struck, even though she had a brother who was sent to reform school, he did not challenge the prosecution's explanations during voir dire, nor did he offer any reasons for the court to cast doubt on the explanations for the strikes. The only statement he made at that time was that he had some concern that the only two African-Americans were struck. Hendrix also had the opportunity to review the transcript of voir dire for six days before trial, yet he still failed to bring any evidence of pretext to the court for its assessment, where the court could have addressed any concerns.

The prosecution's additional explanations that Juror Woodland was a fan of CSI, and that Jurors Woodland and Hairston had relatives in law enforcement, do not transform the prosecution's race-neutral explanation into a pretextual one. The district court took these additional factors into consideration, and in its written denial of Hendrix's motion for a new trial, it commented that while the court agreed with Hendrix that "watching CSI is not a valid reason by itself for striking . . . Woodland when many other panelists had reported watching the same show," the court noted that the CSI factor gave the prosecution's decision "a modest amount of added heft in combination with the fact that Woodland has a relative in prison, particularly when the case was one in which there was no scientific evidence to prove [Hendrix's] possession of the firearm." *See also United States v. Fields*, 483 F.3d 313, n.39 (5th Cir. 2007) ("Some

have claimed that jurors who see the high-quality forensic evidence presented on CSI raise their standards in real trials, in which actual evidence is typically more flawed and uncertain." (quoting Tom R. Tyler, *Viewing CSI and the Threshold of Guilt: Managing Truth and Justice in Reality and Fiction*, 115 Yale L.J. 1050, 1050 (Mar. 2006))).

We find no error in the district court's assessment of the honesty of the prosecution's proffered explanations. The district court had the opportunity to observe the voir dire, and determined that the prosecution gave legitimate and race-neutral showings as to why it struck the two African-Americans from the venire. Hendrix has not provided any sufficient reasons for us to conclude that the district court committed clear error by making this determination. Therefore, we find that the district court's ruling on the prosecution's peremptory challenges on Jurors Woodland and Hairston was proper and did not violate Hendrix's right to equal protection of the law.

## B. Admission of Testimony That a Judge Approved the Search Warrant.

Hendrix argues that the district court erred in allowing Detective Hendrickson's testimony that a judge approved a search warrant for Hendrix's apartment because that information was irrelevant and unfairly prejudicial. We review the district court's evidentiary rulings for an abuse of discretion. *United States v. Holt*, 460 F.3d 934, 936 (7th Cir. 2006). Even if there is a mistake, we will not reverse if the error was harmless. *Id.*

Hendrix argues that, under *United States v. Cunningham*, 462 F.3d 708 (7th Cir. 2006), the procedures that agents follow to obtain authority to gather evidence are not relevant, and evidence that a judge approved a search warrant has the effect of "vouching for the gov-

ernment's case: a judge decided there was probably a gun at the defendant's house so he issued a warrant, and the police discovered that the judge was correct." In *Cunningham*, the government introduced testimony that explained the extensive procedures it used to obtain court authorization for wiretaps on the defendants' phones, and that suggested several senior government attorneys and agents believed that probable cause existed to show that the defendants were involved in a drug conspiracy. *Id.* at 709, 712-13. We reversed the district court's ruling that allowed the admission of the evidence, holding that "[t]he government witness was improperly vouching for how good the evidence was," and "[i]n short, the government piled on needless, unfairly prejudicial evidence that may have affected the jury's judgment, and this error was not harmless." *Id.* at 713.

This case is a far cry from the facts in *Cunningham*. Here, as the government pointed out in its brief, there was no extensive testimony proffered to explain the procedure of obtaining a search warrant, as there was in *Cunningham*. One statement from a witness that a judge approved a search warrant for Hendrix's apartment did not inappropriately strengthen the prosecution's case and was not unfairly prejudicial to Hendrix, unlike the extensive wiretap evidence admitted in *Cunningham*. Furthermore, evidence that the police obtained a search warrant is not unfairly prejudicial, and the district court noted that "[the prosecution] is allowed to say [the police] have a warrant." As we held in *Cunningham*, "[i]t is one thing for a government witness, when telling his story to the jury, to say a search warrant had been obtained, and then the search was made. Although arguably not technically relevant, the information is simply part of the witness's story." 462 F.3d at 714.

In contravention of the district court's ruling, the prosecution elicited testimony from Detective Hendrickson

about a judge's approval of the search warrant. The district court acknowledged that the prosecution failed to follow the ruling of the court, but noted that the testimony of Detective Hendrickson "was not elaborated on" and would not have an effect on the outcome of the trial. We agree. We find no abuse of discretion in the court's assessment to allow the single statement that a judge approved a warrant into evidence. Furthermore, any error was harmless, in light of the overwhelming evidence in front of the jury. Detective Hendrickson and Detective Wegner testified that they recovered a shotgun and four rounds of ammunition from a dresser in the back bedroom of Hendrix's apartment. Officer Moore testified that Hendrix made several incriminating statements at the police station, acknowledging his ownership of the firearm. Therefore, the district court's admission of Detective Hendrickson's testimony into evidence was proper.

### C. Admission of Hendrix's Statements to Officer Moore.

Hendrix challenges the district court's denial of his motion to suppress his statements on the grounds that a "coy" discussion between Hendrix and Officer Moore was the result of custodial interrogation, and thus Hendrix was not given proper *Miranda* warnings. In reviewing a denial of a motion to suppress, we review the district court's factual findings for clear error and questions of law *de novo*. *United States v. Thompson*, 496 F.3d 807, 809 (7th Cir. 2007). Because the resolution of a motion to suppress is a fact-specific inquiry, we give deference to credibility determinations of the district court, who had the opportunity to listen to testimony and observe the witnesses at the suppression hearing. *Id.* Since the district court adopted the credibility determinations of the magistrate judge, we review the magistrate judge's

findings for clear error. *United States v. Biggs*, 491 F.3d 616, 621 (7th Cir. 2007) (citing *United States v. Gillaum*, 372 F.3d 848, 854 (7th Cir. 2004)).

The magistrate judge thoroughly evaluated the evidence and testimony of Officer Moore, and concluded that it was not improper for Officer Moore to answer Hendrix's repeated questions as to the charges against him, and Officer Moore did not intend to elicit an incriminating response from Hendrix when he advised Hendrix that he would face additional charges. The magistrate judge credited the testimony of Officer Moore, and found that Hendrix was agitated and confrontational throughout the conversation with Officer Moore, and that it was not improper for Officer Moore to respond to Hendrix's voluntary admission that all the officers were going to find was a pistol by advising Hendrix that the police found something "larger than a pistol." The magistrate judge also found that nothing Officer Moore said or did prompted Hendrix's explanation of the reason why he kept the firearm in his apartment, and determined that Hendrix chose to speak voluntarily. We find no clear error in the magistrate judge's thorough consideration of the evidence and the testimony of Officer Moore.

Under *Miranda*, a suspect interrogated by law enforcement officers while in custody must be notified of his constitutional rights to counsel and against self-incrimination. There is no dispute that Hendrix was in custody while he was under arrest and handcuffed in the booking area of the jail. The only issue is whether Hendrix was subjected to "interrogation" by Officer Moore.

Not all statements obtained by the police after a person has been taken into custody are considered the product of interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 299 (1980). "Interrogation" refers to "express question-ing" as well as "any words or actions on the part of the

police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 300-01; *United States v. Abdulla*, 294 F.3d 830, 834 (7th Cir. 2002). Under our interpretation of *Innis*, the test is whether a reasonable objective observer would have believed that the law enforcement officer's statements to the defendant were reasonably likely to elicit an incriminating response. *Abdulla*, 294 F.3d at 834 (internal quotations omitted); *United States v. Westbrook*, 125 F.3d 996, 1002 (7th Cir. 1997). A police officer's response to a direct inquiry by the defendant does not constitute "interrogation." *United States v. Briggs*, 273 F.3d 737, 740 (7th Cir. 2001). Moreover, voluntary statements are not subject to *Miranda* warnings, and thus are admissible as evidence. *Miranda*, 384 U.S. at 478. Statements are volunteered when they are not the result of "compelling influences, psychological ploys, or direct questioning." *Arizona v. Mauro*, 481 U.S. 520, 529 (1987); *United States v. Jackson*, 189 F.3d 502, 510 (7th Cir. 1999).

Hendrix argues that his first statement to Officer Moore, that "all they were going to find would be a pistol," resulted from Officer Moore's "coy response" to Hendrix's inquiry as to the charges against him. After Hendrix's repeated demands for information about the charges against him, Officer Moore responded that there would be more charges against Hendrix (other than the initial traffic offense that the arrest warrant was issued on) due to the items found at Hendrix's apartment. The fact that he did not specify the nature of the charges was not a "coy response," but a direct answer, which contained the only information that Officer Moore knew. Therefore, Hendrix's reply that "all they were going to find would be a pistol" was not a result of any interrogation by Officer Moore. It was a voluntary statement, not

prompted by any direct question or encouragement from Officer Moore, and thus not protected by *Miranda*. The statement was properly admitted into evidence.

Next, Hendrix argues his statements, "he call[ed] everything a pistol," and that he had only procured the firearm because "[his] apartment had been broken into . . . and [that he] needed some protection" should have been suppressed because he was deliberately provoked by Officer Moore, who made a "calculated attempt to elicit an incriminating statement, and it worked as intended."

After Hendrix stated that "all they were going to find would be a pistol," Officer Moore told Hendrix that the agents found something larger than a pistol at his apartment. While Officer Moore's comment may have aroused Hendrix's curiosity, a reasonable, objective observer would not believe that the comment was reasonably likely to elicit incriminating statements. Hendrix was not the victim of a "coy" discussion that forced him to make the damning admissions about his knowledge and ownership of the firearm. Rather, Hendrix was simply talking when he should not have been. Hendrix repeatedly reinitiated the conversation with Officer Moore. He was neither coerced nor compelled by Officer Moore to talk about his firearm, but rather encouraged the discussion by asking Officer Moore questions and volunteering information. *See United States v. Cooper*, 19 F.3d 1154, 1162 (7th Cir. 1994) (citing *Arizona v. Roberson*, 486 U.S. 675, 681 (1988)) ("The question of which party encouraged the dialogue between the police and the accused plays an indicative role in the determination of whether the statement was the result of compelled influence."). We conclude that Hendrix's statements were made voluntarily and were not the result of interrogation by Officer Moore.

**D.  Sentencing.**

In challenging his sentence, Hendrix first argues that sentencing him under 18 U.S.C. § 924(e), the Armed Career Criminal Act (the "Act"), in the absence of jury findings as to the nature of his criminal history, violates his Sixth Amendment right to a jury trial. Hendrix asserts that the Act's requirement that the crimes be committed "on occasions different from one another" goes beyond the fact of a prior conviction and is not subject to *Apprendi*'s exception for prior convictions, and therefore should be determined by a jury.[9]

The Act provides that a defendant who is found to violate 18 U.S.C. §922(g) "and has three previous convictions . . . for a violent felony or serious drug offense or both, committed on occasions different from one another . . . shall be . . . imprisoned not less than fifteen years." The district court does not violate a defendant's Sixth Amendment right to a jury trial by making findings as to his criminal record that expose him to greater criminal penalties. *United States v. Williams*, 410 F.3d 397, 402 (7th Cir. 2005). In *Almendarez-Torres v. United States*, the Supreme Court held that recidivism used to enhance a defendant's penalty need not be found beyond a reasonable doubt, but instead is a sentencing factor. 523 U.S. 224, 239 (1998). As we noted in *United States v. Stevens*, 453 F.3d 963, 967 (7th Cir. 2006), *Almendarez-Torres* remains intact, notwithstanding subsequent decisions. *See, e.g.*, *Apprendi v. New Jersey*, 530 U.S. 466, 489 (2000) (holding that "[o]ther than the fact of a prior conviction,

---

[9]  Hendrix acknowledges that we have rejected this argument in *United States v. Browning*, 436 F.3d 780 (7th Cir. 2006) and *United States v. Schlifer*, 403 F.3d 849 (7th Cir. 2005), but nevertheless raises it to preserve his right to review of the issue by the Supreme Court.

any fact that increases the prescribed maximum must be submitted to a jury and proven beyond a reasonable doubt"); *Shepard v. United States*, 544 U.S. 13, 24-26, 37-38 (2005) (acknowledging the continuing validity of *Almendarez-Torres*); *see also United States v. Skidmore*, 254 F.3d 635, 642 (7th Cir. 2001) (holding that an enhancement under 18 U.S.C. §924(e)(1) based on a defendant's three prior violent felonies is proper under *Apprendi*). Furthermore, we have held that unless and until the Supreme Court chooses to overrule *Almendarez-Torres*, we are bound by it. *Stevens*, 453 F.3d at 967*; United States v. Morris*, 293 F.3d 1010, 1012 (7th Cir. 2002); *see, e.g.*, *United States v. Browning*, 436 F.3d 780, 782 (7th Cir. 2006) (holding that the continued authority of *Almendarez-Torres* is not for us to decide).

With respect to Hendrix's argument that the Act's requirement that the crimes be committed "on occasions different from one another" goes beyond the fact of a prior conviction, and should be determined by a jury*,* we have already rejected this argument in *United States v. Schlifer*, 403 F.3d 849, 852 (7th Cir. 2005).[10] Accordingly, the district court's determination from the PSR that Hendrix had three previous convictions to satisfy the Armed Career Criminal Act is not impermissible factfinding, and Hendrix's sentence does not violate the Sixth Amendment.

Hendrix also argues that sentencing him with a presumption that within-Guideline sentences are entitled

---

[10] In *Schlifer,* the defendant challenged the determination that his convictions were for crimes of violence and whether they were "related." 403 F.3d at 852. We rejected his argument and held that there was "no authority for parsing out the recidivism inquiry," and the enhancement under the Act was not a violation of the Sixth Amendment. *Id.* (citing *Morris*, 293 F.3d at 1012).

to more deferential review than sentences outside the Guidelines' recommendation violates the Sixth Amendment right to jury trial.[11]

A sentence within the defendant's Guidelines range is presumptively reasonable. *United States v. Gammicchia*, 498 F.3d 467, 468 (7th Cir. 2007); *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). The Supreme Court has held that this presumption is proper. *Rita v. United States*, ___ U.S. ___, 127 S.Ct. 2456, 2462-63 (2007). As we held in *United States v. Gama-Gonzalez,* to say a sentence within the Guideline range is presumptively reasonable, is *not* to say that district judges should impose sentences within the range. 469 F.3d 1109, 1110 (7th Cir. 2006) (citing *United States v. DeMaree*, 459 F.3d 791, 794-95 (7th Cir. 2006)) (emphasis in original). Rather, "[i]t is only to say that, *if* the district judge does use the Guidelines, then the sentence is unlikely to be problematic." *Id.* (emphasis in original).

Hendrix was sentenced to the low end of the Guideline range. In sentencing Hendrix, the district court considered the proper factors set out in 18 U.S.C. §3553(a), noting that Hendrix's lengthy criminal record qualified him as an armed career criminal. The district court considered the need to hold Hendrix accountable for his actions, and to protect the community from further crime. Accordingly, we do not find the district court's sentence of 262 months' imprisonment to be unreasonable, nor do we feel that the sentencing process infringed upon Hendrix's Sixth Amendment rights.

---

[11] Hendrix acknowledges we have rejected this argument in *United States v. Wurzinger*, 467 F.3d 649 (7th Cir. 2006), however he again makes this argument to preserve the issue for further appeal.

## III.  Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.

A true Copy:

    Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*