In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-1127

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

AHMET KESKES,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:09-cr-00797-1—**Samuel Der-Yeghiayan**, *Judge.*

ARGUED NOVEMBER 26, 2012—DECIDED JANUARY 7, 2013

Before ROVNER, WILLIAMS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* A jury convicted Ahmet Keskes of six counts of wire fraud and five counts of mail fraud arising out of his receipt and sale of stolen merchandise over the Internet. The district court sentenced him to 78 months' imprisonment on each count to run concurrently. Keskes timely appealed, arguing that the district court erred in denying his motion for a mistrial based on the prosecutor's comment that a

judge had issued a search warrant for Keskes's warehouse and that the court erred in admitting testimony about "gypsies" being thieves and testimony about statements attributed to a man named "Robert." (We intend no disparagement by the use of the term "gypsy" throughout this opinion. It is a term used by witnesses and the lawyers at trial, and its use, as noted, is entwined in one of the issues in this appeal. We use the term merely to explain how it was used during the trial and to address the claimed error.) Keskes also argues that even if each of the alleged errors was harmless, the cumulative errors denied him a fair trial. Finally, he argues that the court erred at sentencing by relying on his silence as a sign of a lack of remorse and by relying on an inaccurate fact. Finding no error, we affirm.

## I.  BACKGROUND

Keskes was the owner, manager, and president of Asena Corporation, a resale operation that sold goods on its own website (www.asenashop.com), eBay, and Amazon.com. Between 2006 and 2009, Keskes sold more than $3.5 million in merchandise over the Internet. Bank records indicate that during that time, Asena disbursed more than $12.2 million but none of its checks was written to any of the manufacturers of the products Keskes sold. Instead, Keskes wrote 273 checks for a total of $3.1 million to "Cash" and another $2.1 million to dozens of individuals. To register to sell an item for sale on eBay or Amazon.com, a seller has to set up an account, which includes accepting the terms of the user

agreement; otherwise, the seller is not authorized to use these websites. The user agreements prohibit the sale of stolen items.

In 2009, FBI agents searched Keskes's warehouse and seized enough merchandise to fill 350 large cardboard boxes. The items seized included approximately 70 Victoria's Secret perfumes, individually wrapped in plastic; multiple toothbrushes from Bed Bath & Beyond; multiple golf clubs with no head covers and no tool sets; approximately 50 to 100 items from Toys "R" Us; approximately 100 items from Hobby Lobby; approximately 50 items manufactured by FURminator; and numerous headlights from Sylvania Company, an auto-parts supplier. Many of the items seized still had security tags or store price tags on them. No documents were found to suggest that Keskes had obtained the products from liquidators or at closeout sales. Nor were any invoices from the manufacturers of the products found. The warehouse was full of empty boxes with shipping labels still on them. None came from the manufacturers, liquidators, or closeout companies. The return addresses on many of the boxes did not exist or were not connected to a legitimate supplier. Two packages that FedEx was holding for Keskes contained a hodge-podge of unrelated items such as life vests, Oral-B electric toothbrushes, radios, a calculator, and cell phone devices. Many of the items still had the security tags on them.

Representatives from seven different corporations—Limited Brands (the parent company of Victoria's Secret and Bath & Body Works), Hobby Lobby,

FURminator, Acushnet Golf Company, Callaway, Bed Bath & Beyond, and Toys "R" Us—testified at trial that Keskes was not an authorized retailer of their products but sold large quantities of their new, popular products for less than the wholesale price. In some cases, Keskes sold the products below production costs. He even sold approximately 744 items for one penny. Yet he still had a substantial profit margin: he purchased his inventory for approximately $732,000 and sold it for $1.2 million. The suggested retail price, however, was approximately $1.73 million.

For example, in 2009, Keskes was selling a large volume of Limited Brands's most popular items, including perfumes that are made exclusively for sale at Victoria's Secret, Bath & Body Works, and in a limited quantity at military commissaries. The items were not on closeout or near the end of their product cycles, and they were not being liquidated. Keskes advertised the merchandise as new, unopened, and never used. Some of the merchandise still had store price stickers and security tags on them. Some was still in its original packaging. Joe Hajdu of Limited Brands testified that the security tags are not attached to products until the products reach the retail stores. He also testified that the security tags on the items involved in Counts Seven through Ten were still active. Security tags are to be deactivated when customers purchase the product.

As another example, Keskes also advertised golf clubs for sale as new, "like new," or with "minor shop wear" and without head covers. The individuals who pur-

chased clubs charged in Counts One through Five testified that the clubs looked new and had no scratches on them. One purchaser stated that if the club he had purchased was lined up in a pro shop with new clubs, he could not pick out the purchased club. Lisa Rogan, a representative from Acushnet, testified that Acushnet requires retailers to sell head covers with golf clubs but most retailers keep the covers in the back room until the time of sale—not on display to the public—because the covers make it difficult to see the clubs. The FBI found numerous golf clubs in Keskes's warehouse but no head covers.

Gordon Barnhill, a retired Chicago Police sergeant who worked part-time for Keskes between 2006 and early 2009, and then full-time until September 2009, testified at trial. Barnhill stated that he gradually came to learn that Keskes obtained his products from "gypsies," who Barnhill described as "a group of people who make their living through dishonest practices, theft, deceptive practices, and fraud." Barnhill testified that in late 2008 or early 2009, he concluded that Keskes was selling stolen merchandise. This was based in part on the prices that Keskes paid for the goods. Barnhill explained that he kept working for Keskes because he was a good friend.

Barnhill described Keskes's business practices and said that Keskes received complaints that he was selling stolen merchandise, including computers. Barnhill stated that Keskes set the prices for the goods he purchased and that he chose the price by determining what other online retailers were charging and then going below

their prices. Barnhill testified that he observed "gypsies" enter the warehouse with boxes or bags full of merchandise and leave the merchandise on the floor. On other occasions, merchandise arrived in cardboard boxes shipped via FedEx or UPS. The merchandise was organized in a "Helter Skelter," "mixmosh" way with "no set pattern." Occasionally the merchandise came with a handwritten note. Barnhill testified that he saw price tags and security tags on the merchandise and that some of the address labels on the boxes came from residential areas and not commercial or business areas.

On several occasions, Keskes asked Barnhill to run "warrant checks" on "gypsy people" and let Keskes know if anyone had any outstanding warrants. Barnhill did so, in violation of police department rules. Barnhill told Keskes not to do business with someone who had an outstanding warrant—and not to do business with "gypsies" at all—but Keskes did not follow his advice. In the winter of 2008, Barnhill spoke with Keskes about the fact that Keskes was purchasing items with store security tags and price tags still on them. Barnhill also told Keskes that the handwritten invoices did not appear legitimate and that the return address labels on the shipments of products were not from legitimate businesses and appeared to be written by "gypsies." Keskes told Barnhill not to worry about it and walked away. On other occasions, Barnhill told Keskes that he believed the items Keskes was selling were stolen. Keskes told Barnhill not to worry or walked away. Then, in August 2009, Barnhill confronted Keskes about selling stolen merchandise, saying, "Ahmet, I know what

you're doing, you have to stop, you have to think of [your wife], you have to think of your kids." Keskes simply shrugged his shoulders and walked away.

The FBI had begun investigating Keskes in early 2006. As part of its investigation, the FBI used a confidential informant, Marek Sturgulewski, who testified at trial. Sturgulewski had known Keskes for years but had not kept in touch with him. From 2002 until 2006, Sturgulewski worked at a restaurant where he became acquainted with a group of people who identified themselves as "gypsies." Sturgulewski understood "gypsies" to refer to "an ethnic group that comes in mostly from Eastern Europe." He stated that the members of the group talked about "going shopping" as a way to make money and tried to cash checks at the restaurant that were made out to fictitious names like SpongeBob. (SpongeBob Square Pants is the title character in a popular American animated television series that premiered in 1999.) Sturgulewski met "Robert," a man who referred to himself as a "gypsy."

Sturgulewski testified about a conversation he had with Robert in late 2005 or early 2006. Robert told Sturgulewski "that his family, his group, is going around [the] United States for a few weeks to steal products from retail stores and resell it to buyers in the Chicago area." Robert said he was working with other people and identified some of the stores they were stealing from and some of the items they were stealing. He also explained in detail how he and his group managed to steal the items. Sturgulewski testified that

Robert mentioned that he knew Keskes, saying where
he was located in Streamwood, Illinois, and the name of
his store, Asenashop. Robert also told Sturgulewski that
Keskes was purchasing stolen products from Robert.
Robert explained that he shipped products by FedEx
or UPS or delivered them directly, and Keskes paid him
in return. Not long after this conversation, Sturgulewski
went to Keskes's warehouse several times and observed
"groups of gypsies" enter the warehouse with bags,
stay inside for an hour or two, and then leave empty-
handed. Sturgulewski also followed some "gypsies"
to various stores, where he saw them stealing various
products.

On March 23, 2006, Sturgulewski contacted Keskes
by phone. Their recorded conversation was played for
the jury. Sturgulewski told Keskes, "I talked to some
people, and  . . . they got some stuff. You know who
I'm talking about. . . . You know, I have some knowledge,
and I have some connections." Keskes responded,
"I know," and laughed. Sturgulewski explained that
"Robert told me. You know Robert?" Keskes said, "Yeah,
yeah, yeah." Then Sturgulewski stated that "Robert
told me he went to Germany," and Keskes said, "Yes,
I know."

On April 21, 2006, Sturgulewski, equipped with a
recording device, met with Keskes at a restaurant.
Their recorded conversation was played for the jury.
Keskes stated that he can buy anything, provided that
he sets the price. Sturgulewski and Keskes discussed
that Keskes's vendors did not like to be paid with

checks, and Sturgulewski said that "some of them, they're taking, taking checks. You remember Robert?" Keskes answered, "Mm-hmm. . . . Yeah, but . . . he's a, he's a trusted guy, you know?" Sturgulewski stated that his "main concern is paying out the gypsies," and Keskes offered to write "empty checks" (checks without a payee name) for them. Sturgulewski suggested that Keskes write a check to a "second party" or a person that did not exist, even to SpongeBob. Keskes responded, "I mean, if they accept the checks, that's all right."

During their conversation the following exchange occurred:

| | |
|---|---|
| Sturgulewski: | Ahmet, did, you, did you ever think of it . . . just imagine, one gypsy family . . . just try to visualize this . . . how much stuff they can steal. |
| Keskes: | I don't know . . . . I don't wanna look at that way, I just . . . see . . . . |
| Sturgulewski: | To me it's just like overwhelming. |
| Keskes: | I don't know . . . I don't know what they do, how they do . . . I don't look at [it] that way. I look at, I pay money and . . . . |
| Sturgulewski: | It's business, that's it. |
| Keskes: | I don't care what, how they do, what they do . . . I don't . . . I don't care, because as long as . . . anybody |

> comes in. No tails, what's going on with that, and Gordon is in the front and he is going to check, his ass is on the phone.

A short while later Sturgulewski remarked, "[Y]ou don't check if it's stolen or not stolen, you don't, you don't . . . you get a[n] invoice, you pay," and Keskes responded, "[Y]eah."

After that conversation, Sturgulewski began purchasing products from persons he described as "gypsies" and selling the products to Keskes. Sturgulewski testified that Keskes told him what to purchase—high-end electronics, brand name products, and sporting goods. Sturgulewski received the products in cardboard boxes and delivered them to Keskes's warehouse. The products included dog-training collars, Oral-B Sonic toothbrushes, hard drives, cables, and computer printers—all commingled in the boxes. Keskes set the price and paid Sturgulewski in cash. Sturgulewski noticed that some of the products in the warehouse still had the store packaging, store labels, and price tags on them.

Sturgulewski stated that in July 2007, he had obtained golf clubs from a person named "Andre" or "Adam." The jury watched a video recording of Sturgulewski receiving several golf clubs from a variety of manufacturers at Andre's home. Andre removed golf clubs from a closet, and he and his wife packed them into a shipping box. None of the clubs had head covers, some had price tags on them, and all of the clubs were brand new. After Sturgulewski left Andre's

home, Andre called him and instructed him to pay Andre in the name of "Toni Kolas" if Sturgulewski paid with a check. Asena's bank records show that $43,160 in checks were written to "Toni Kolas" between 2006 and 2009.

## II. DISCUSSION

### A. Prosecutor's Comment that a Judge Issued a Search Warrant

Keskes first argues that the district court abused its discretion in denying his motion for a mistrial. In his opening statement, the prosecutor told the jury that "in September of 2009, the FBI agents went to a judge, and they obtained a search warrant . . . ." Keskes objected and moved for a mistrial, arguing that the prosecutor's remark suggested that there had been a judicial finding of guilt. The court offered to give a limiting instruction to the jury, stating that the fact the government had obtained a search warrant from a judge was merely permission to search and does not denote the defendant's guilt, and that the jury would have to decide whether the defendant is guilty or not guilty based on the evidence solely presented at trial. Keskes did not take the court up on its offer. The court took Keskes's motion under advisement and the prosecutor continued with his opening statement, telling the jury that the FBI had found approximately 300 boxes of merchandise in Keskes's warehouse, much of which was still in the original packaging with security tags and in new condition.

The district court ultimately denied the motion for a mistrial, finding that the single, passing reference to the judicial process was not prejudicial. It relied on *United States v. Hendrix*, 509 F.3d 362 (7th Cir. 2007), where we concluded that a single "statement from a witness that a judge approved a search warrant for [the defendant's] apartment did not inappropriately strengthen the prosecution's case and was not unfairly prejudicial." *Id.* at 372. We contrasted the single statement with the "extensive wiretap evidence" admitted in *United States v. Cunningham*, 462 F.3d 708 (7th Cir. 2006). *Hendrix*, 509 F.3d at 372. In this case, however, the district court noted that the prosecutor's "passing comment" was made in opening statement, which is not evidence. On appeal, Keskes argues that the prosecutor's remark improperly bolstered the case against him by presenting an inadmissible judicial opinion of his guilt.

We review the denial of Keskes's motion for a mistrial for an abuse of discretion. *United States v. Vargas*, 689 F.3d 867, 873 (7th Cir. 2012), *cert. denied,* 2012 WL 5465562 (U.S. Nov. 6, 2012). "[T]he trial court 'is in the best position to determine the seriousness of the incident in question, particularly as it relates to what has transpired in the course of the trial.'" *Id.* (quoting *United States v. Clarke*, 227 F.3d 874, 881 (7th Cir. 2000)). We "'must affirm unless we have a strong conviction that the district court erred,' and the error committed was not harmless." *Id.* (quoting *Clarke*, 227 F.3d at 881). "The ultimate inquiry . . . is 'whether the defendant was deprived of a fair trial.'" *Id.* (quoting *Clarke*, 227 F.3d at 881).

Keskes was not deprived of a fair trial by the prosecutor's single, passing comment in opening statement that the FBI had obtained a search warrant from a judge. The comment was made in opening statement only; opening statements are not evidence. Just moments before the comment was made, the district court had instructed the jury that "opening statements are not evidence." The prosecutor made no further reference to the judicial process for obtaining a warrant. No evidence was offered to show that the judge issued a warrant. And the government did not argue—as Keskes does here—that the issuance of the warrant was evidence of Keskes's guilt. Nor did the government argue that the issuance of the warrant was evidence that the items in Keskes's warehouse were actually stolen. The passing comment in the prosecutor's opening statement is even less troubling than the witness's statement in *Hendrix*, which we concluded would not have affected the outcome of the trial. 509 F.3d at 373.

Furthermore, the court's final charge to the jury instructed them that "[c]ertain things are not evidence and I will list them for you. . . . [T]he opening statements and closing arguments by the attorneys are not evidence." We presume that the jury followed the court's instructions. *United States v. Villegas*, 655 F.3d 662, 673 (7th Cir. 2011). Keskes has offered nothing to overcome that presumption. The district court did not abuse its discretion in denying Keskes's motion for a mistrial.

But even if there was error, it was harmless in light of the strength of the evidence against Keskes, the fact that

the comment was not evidence, and the fact that the judge's role in issuing the warrant was never mentioned again. We "can say with fair assurance that the verdict was not substantially swayed" by the prosecutor's comment that a judge had issued a search warrant for Keskes's warehouse. *See United States v. Miller*, 673 F.3d 688, 701 (7th Cir. 2012) (discussing harmless-error analysis).

### B.  "Gypsies as Thieves" Evidence

Next, Keskes argues that the district court plainly erred in admitting testimony from government witnesses Sturgulewski and Barnhill about "gypsies" being inveterate thieves in violation of Rules 401 and 403 of the Federal Rules of Evidence. He asserts that the "gypsies as thieves" testimony could only serve to prove his guilt by guilt by association. Keskes acknowledges that his Rule 401 and 403 objections were forfeited, and thus, we review for plain error. *United States v. Ambrose*, 668 F.3d 943, 963 (7th Cir.), *cert. denied*, 133 S. Ct. 249 (2012). Under the plain error standard, we consider whether there was (1) an error, (2) that was plain, and (3) that affected substantial rights. *Id.* On plain error review, "[w]e could reverse only if exclusion of the evidence 'probably would have resulted in an acquittal.'" *United States v. Collins*, 604 F.3d 481, 487 (7th Cir. 2010) (quoting *United States v. Rangel,* 350 F.3d 648, 650 (7th Cir. 2003)). The defendant "must show that the evidence was so 'obviously and egregiously prejudicial' that the trial court should have excluded it even without any

request from the defense." *Id.* (citing *United States v. LeShore*, 543 F.3d 935, 939 (7th Cir. 2008)).

Keskes concedes that in his recorded conversations with Sturgulewski that were played at trial Keskes used the term "gypsy" and acknowledged doing business with "gypsies." As the government argues, both Sturgulewski and Barnhill described "gypsies" as thieves and gave specific reasons why they thought the "gypsies" provided Keskes with stolen merchandise. For example, Sturgulewski testified that some of them tried to cash checks that were made out to phony names like SpongeBob. He also stated that he had followed a group of "gypsies" to Indiana where he saw them steal products from a Radio Shack store. Barnhill testified that he had observed security tags and price tags on the products at Asena dropped off by "gypsies."

The government did not argue guilt by association or use the "gypsies as thieves" evidence to prove that Keskes knew the items provided to him were stolen. Nor did it argue that Keskes was a bad person or guilty of the charged offenses simply because he had dealt with the "gypsies." Instead, the government argued that Keskes's pattern of business dealings demonstrated his knowledge that the merchandise was stolen. The merchandise was delivered to Keskes in cardboard boxes with fictitious return addresses, and the "gypsies" brought boxes and bags of a hodge-podge of items, many of which still bore store stickers or security tags. The merchandise arrived in the original packaging and was new and unopened. The golf clubs served as a

prime example of the stolen merchandise—none of the clubs at Asena had head covers, and the evidence was that retailers kept the head covers separate from the clubs on display. And Keskes determined the prices he would pay his suppliers. He paid them in cash or used empty checks and checks with phony payee names. The government did not emphasize the fact that Keskes did business with "gypsies," but rather, that he did business with people who steal. The government's argument was used to persuade the jury that Keskes had the requisite knowledge that the merchandise was stolen.

The court instructed the jury that "[k]nowledge may be proved by the defendant's conduct and by all the facts and circumstances surrounding the case. You may infer knowledge from a combination of suspicion and indifference to the truth." This is commonly referred to as an "ostrich" instruction. The facts and circumstances established Keskes's knowledge. Keskes received repeated warnings from Barnhill that he was receiving stolen goods and customers complained that Keskes was selling stolen goods, but Keskes did nothing—he told Barnhill not to worry, shrugged his shoulders, and walked away. The jury heard the recorded conversation between Sturgulewski and Keskes in which Keskes effectively said he did not care if the merchandise he received was stolen—"I don't care what, how they do, what they do." And when Sturgulewski said to Keskes that "you don't check if it's stolen or not stolen," Keskes replied, "[Y]eah." Keskes was concerned only if the "gypsies" had "tails," meaning that they

were being followed by the police. And Special Agent Brian Brusokas of the FBI testified that the boxes in which products were shipped to Keskes had fake addresses for the senders.

Moreover, Keskes sold products with active store security tags and price tags. He sold new, popular, high-theft products at far below retail or wholesale prices, and at times even below production costs. Yet he made a substantial profit. Keskes was not an authorized dealer of the products he sold, but he sold thousands of such products anyway, including branded products manufactured for exclusive sale in certain retail stores. And he never paid a manufacturer, liquidator, or closeout business. He paid individuals: $2.1 million in checks payable to named persons and $3.1 million in checks to "Cash." Thus, contrary to Keskes's claim, the evidence tending to prove that the items Keskes sold had been stolen by "gypsies" was not limited to the testimony of Sturgulewski and Barnhill.

Keskes also argues that the government witnesses portrayed "gypsies" so reprehensibly that there is a substantial risk the jury found him guilty because he dealt with reprehensible people. The government did not argue the evidence in this way. Rather, the evidence that the "gypsies" beat up someone because he did not pay tended to show that Keskes's suppliers did not act like legitimate business people—a legitimate business person can resort to lawful means to obtain payment. Keskes says that the evidence was not expressly argued in this way in the government's closing. Nonetheless,

the jury can draw reasonable inferences and use their common sense in assessing the evidence.

Finally, Keskes complains that the witnesses offered "offensive and stereotypical" descriptions of "gypsies" related to their ethnicity. These descriptions did not deprive Keskes of a fair trial. Keskes did not object to the descriptions related to ethnicity, and the descriptions were only a small part of a five-day trial. At a pretrial conference, the government advised the court and defense counsel that some of its witnesses would use the term "gypsy" during their testimony because that was how the witnesses knew the people. The prosecutors said they would strive not to use the term. But as the court recognized, "[Y]ou cannot stop witnesses from testifying." There was a discussion about the parties suggesting a different term, but the defense proposed none and did not object to use of the term "gypsy." Nor did the defense object to use of the term during the trial. Moreover, defense counsel used the term at least as often as the prosecutors did in opening statement, cross-examination, and closing argument. It is hard for Keskes to complain about the government witnesses' and attorneys' use of a term that his own attorney used freely.

The district court did not plainly err in admitting the "gypsies as thieves" testimony. But even if there was error, the circumstantial evidence of Keskes's knowledge that he bought stolen items from the "gypsies" is so compelling that it cannot be said that Keskes probably would have been acquitted without the "gypsies as thieves" testimony.

### C.  Testimony About Robert's Statements

Keskes argues that the district court erred in admitting Sturgulewski's testimony about Robert's statements as background information in violation of Rule 403. Keskes submits that we review for plain error. The government responds that Keskes waived any objection to Sturgulewski's testimony about Robert's statements. The government also argues that Keskes's challenge lacks merit.

Prior to trial, the government filed a *Santiago* proffer, *see United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), *overruled on other grounds by Bourjaily v. United States*, 483 U.S. 171 (1987), seeking the admission of Robert's statements as coconspirator statements. Keskes objected, but the district court ruled that the statements were admissible. At trial, however, the prosecutor stated that "we [the parties] have agreed, we have statements . . . made by a guy named Robert to the defendant," and that it was seeking the admission of Robert's statements as background information to explain why the informant Sturgulewski met with Keskes and what Sturgulewski had in his mind at the time. The prosecutor suggested that a limiting instruction would be appropriate. Then the following exchange occurred between the court and defense counsel:

> Court:      So what did you two agree?
>
> Counsel:   Your Honor, that would be satisfactory to me in light of the previous ruling. We have resolved some issues between us.

Court:      Okay.

Counsel:    So, that's correct, your Honor, a limiting
            instruction informing the jury that it is
            not—that these statements are not to be
            used for the truth of the matter
            asserted . . . . In plain English, it's hearsay,
            but it's not . . . being used for that purpose.

Then the prosecutor noted his understanding that
defense counsel "was going to withdraw his objections
to . . . [statements from another coconspirator]" because
the government was not going to introduce the
statements but was "just going to show a video"
recording of Sturgulewski meeting with "Andre," identi-
fied in the *Santiago* proffer as "Co-Conspirator B."

" '[W]aiver occurs when a defendant intentionally
relinquishes or abandons a known right.' " *United States v.
Hible*, 700 F.3d 958, 961 (7th Cir. 2012) (quoting *United
States v. Gaona*, 697 F.3d 638, 641 (7th Cir. 2012) (internal
quotation marks omitted)). "[W]hen the defendant selects
[from among arguments] as a matter of strategy,
he . . . waives those arguments he decided not to pres-
ent." *United States v. Jaimes-Jaimes*, 406 F.3d 845, 848
(7th Cir. 2005) (citation omitted).

Keskes agreed that the testimony about Robert's state-
ments could be admitted for background purposes
along with a limiting instruction. Even though the
court had ruled that the statements were admissible as
coconspirator statements, Keskes did not have to agree
to their admission, whether as background information
or otherwise. Instead, he could have maintained his

objection to their admission for any purpose and then raised the issue on appeal. But Keskes made a strategic decision to agree to the statements' admission as background information. Because of the parties' agreement, the statements came in for background purposes only and could not be considered for their truth. If admitted for their truth, Robert's statements would have been the only *direct* evidence that Keskes was buying and necessarily selling stolen goods.

Furthermore, the government introduced a more abbreviated version of the testimony about Robert's statements than was set forth in the *Santiago* proffer. It did not introduce, for example, testimony that Robert said Keskes was selling a high volume of stolen property, or that when certain vendors were on the road stealing merchandise, they would access Keskes's eBay accounts and list items for sale on their own. Keskes argues that the statements should have been admitted in a more truncated way. Perhaps more detail came in than was necessary to serve as background. But defense counsel did not press for further truncation. Thus, Keskes waived, not merely forfeited, the argument that the testimony about Robert's statements was inadmissible. His waiver precludes our review. *Hible*, 700 F.3d at 961.

Even assuming that Keskes did not waive the argument, we would review only for plain error because he did not object at trial. *Ambrose*, 668 F.3d at 963. Statements that are not offered for the truth of the matter asserted but rather to provide background and context

for a witness's actions, thereby filling gaps in the evidence, may be admissible. *United States v. Penaloza*, 648 F.3d 539, 544 (7th Cir. 2011). But such evidence "may be inadmissible . . . if the danger of unfair prejudice substantially outweighs its probative value." *Id.* The court admitted the testimony about Robert's statements not for the truth of the matters asserted, but as background information. The statements explained why Sturgulewski approached Keskes and offered to provide him with stolen merchandise, even though they had not been in contact in years.

And the danger of unfair prejudice did not substantially outweigh the evidence's probative value—the risk of unfair prejudice was close to nil. First, the district court gave a limiting instruction both immediately before the statements were admitted and again in the final jury instructions, indicating that the statements should not be considered for their truth but only as background information to understand why Sturgulewski did certain things. In addition, the defense could anticipate and prepare for the testimony about Robert's statements because the anticipated testimony was set forth in the *Santiago* proffer. Finally, the testimony about Roberts's statements was only a very small part of Sturgulewski's extensive testimony and took up only five pages of the 900-plus-paged trial transcript.

But even if the court erred in admitting the testimony about Robert's statements, despite the lack of objection from the defense and based on the parties' agreement that the testimony was indeed admissible as back-

ground information, the error was harmless. Given the abundance of circumstantial evidence that Keskes knew he was selling stolen merchandise, he cannot show that the exclusion of the testimony "probably would have resulted in an acquittal." *Collins*, 604 F.3d at 487 (quotation and citation omitted).

Keskes also argues cumulative error. But because he has not shown any trial error, he cannot show cumulative error. *United States v. Boling*, 648 F.3d 474, 482-83 (7th Cir. 2011).

### D.  Sentencing Issues

Keskes argues that the district court violated his Fifth Amendment right to remain silent by equating his silence at sentencing with a lack of remorse and consequently increasing his sentence. Keskes did not object at sentencing, so we review for plain error. *United States v. Winters*, 695 F.3d 686, 689 (7th Cir. 2012). As noted, "[f]or there to be plain error, there must be error, the error must be clear or obvious, and the error must affect the defendant's substantial rights." *Id.* If a plain error occurred, we consider "whether that error affected [the defendant's] substantial rights by resulting in a different sentence than he otherwise would have received." *United States v. Durham*, 645 F.3d 883, 900 (7th Cir. 2011), *cert. denied*, 132 S. Ct. 1537 (2012); *United States v. Corona-Gonzalez,* 628 F.3d 336, 341 (7th Cir. 2010).

"[S]ilence can be consistent not only with exercising one's constitutional right, but also with a lack of remorse."

*Burr v. Pollard*, 546 F.3d 828, 832 (7th Cir. 2008). A lack of remorse is a proper sentencing consideration "because it speaks to traditional penological interests such as rehabilitation (an indifferent criminal isn't ready to reform) and deterrence (a remorseful criminal is less likely to return to his old ways)." *Id.* Sometimes it can be "difficult to distinguish between punishing a defendant for remaining silent and properly considering a defendant's failure to show remorse" in sentencing. *Id.* (quoting *Bergmann v. McCaughtry*, 65 F.3d 1372, 1379 (7th Cir. 1995)).

The record shows that Keskes was not punished for exercising his constitutional right to remain silent, but rather that the district court considered his lack of remorse in determining his sentence. Like the defendants in *Burr* and *United States v. Johnson*, 903 F.2d 1084, 1090 (7th Cir. 1990), where we found no Fifth Amendment violations, Keskes did not assert his Fifth Amendment privilege at the sentencing hearing. Had he done so, he would have alerted the court to the fact that his silence should be viewed as an exercise of his constitutional right rather than a lack of remorse. And as in *Johnson*, 903 F.2d at 1090, where the court explicitly recognized the defendants' right not to acknowledge their crimes, the district judge here expressly stated that Keskes did not have to address the court at sentencing.

Furthermore, the district court identified other factors besides Keskes's silence that reflected a lack of remorse: "after being convicted at trial, [Keskes] has still refused

to acknowledge his responsibility for his crime and argued in his sentencing memorandum that he did not know the merchandise he received was stolen." The record supports these findings. The presentence report indicates that Keskes stated that he intended to "prove [his] innocence" and that he had never done anything wrong in his life. And Keskes's sentencing memorandum begins by asserting that "[a] lack of knowledge about how merchandise was obtained does not absolve him of responsibility for aiding in the selling of stolen merchandise online." The refusal to recognize and accept responsibility for his crimes supports a finding that Keskes showed a lack of remorse. *See id.* (identifying the defendant's denial of guilt in his version of the offense in the presentence report as one reason justifying the sentence). The district court did not violate Keskes's constitutional right to remain silent and did not plainly err in relying on his lack of remorse at sentencing.

Keskes also maintains that the district court erred in sentencing by relying on an inaccurate fact—improper storage of the skin care products he sold could harm the public. At sentencing the court said:

> In considering the need in this case to protect the public from the crimes of the defendant, I note that the defendant's offense did not involve violence. However, the public needs to be protected from individuals capable of committing such complex fraud as in the instant action. Costs related to thefts are passed upon the public.

*One retailer also indicates that the defendant sold stolen products such as skin products which, if not properly stored, could harm users and indicates that the defendant placed the public's health at risk.*

(emphasis added). Keskes argues that although there was evidence that he sold skin care products, there was no evidence that they needed special storage before sale to avoid harming the end user.

"A district court commits a significant procedural error in sentencing when it '. . . select[s] a sentence based on clearly erroneous facts[.]'" *Corona-Gonzalez*, 628 F.3d at 340 (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). Keskes concedes that he did not object at sentencing, so we again review for plain error. *Id.*

The district court had a victim impact statement from a Limited Brands representative, stating that "[w]hen a 'customer' purchases stolen items from a fence (such as skin care items) this creates a health concern directly to the 'customer.' Any merchandise that a person would apply directly to their body could cause injury if said merchandise was not stored and controlled properly or had expired." Another Limited Brands representative had visited Keskes's warehouse in May 2009 and had taken photographs on the premises, showing rooms with empty, open boxes scattered on the floor, boxes of products stacked on shelves, and products stacked inside open cardboard boxes sitting on the floor or in postal service crates. These products included skin creams. In addition, Barnhill testified that he observed people bring items into the warehouse in large bags

that they would drop on the floor in the shipping area and that the items were organized in a "Helter Skelter" and "mixmosh" way.

Given the scattered and apparently unorganized storage of the products in the warehouse and the victim impact statement, the record supports the district court's concern that Keskes created a risk to the public's health by selling certain products. Even without evidence that Keskes's own storage of skin products was improper, the fact that Keskes bought stolen skin creams from the thieves created a risk to the public. And the record supports the inference that Keskes would not have cared about any risk to the public's health. Thus, Keskes has not shown plain error.

Even assuming that the district court relied on a clearly inaccurate fact, Keskes has not shown that the error is "not only 'palpably wrong,' but also likely to 'have resulted in a different sentence.'" *Corona-Gonzalez*, 628 F.3d at 341. In considering the need to protect the public from Keskes's crimes, the court mentioned the risk to the public's health only once and also referenced the need to protect the public from individuals capable of committing complex frauds and the fact that costs related to thefts are passed on to the public.

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM Keskes's conviction and sentence.